## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | |
|---|---|
| TERRY HARRINGTON, individually and in his capacity as the father of NICOLE ANTOINETTE HARRINGTON, | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| vs. | )<br>) |
| COUNTY OF POTTAWATTAMIE, IOWA, CITY OF COUNCIL BLUFFS, IOWA, DAVID RICHTER, in his individual and official capacities, JOSEPH HRVOL, in his individual and official capacities, DANIEL C. LARSEN, in his individual and official capacities, LYLE W. BROWN, in his individual and and official capacities, and JOHN DOES ONE THROUGH NINE, in their individual and official capacities, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

No. _____

## COMPLAINT AND JURY DEMAND

For causes of action against Defendants County of Pottawattamie, Iowa, City of Council

Bluffs, Iowa, Dave Richter, Joseph Hrvol, Daniel C. Larsen, Lyle W. Brown, and John Does One

through Nine, Plaintiff Terry Harrington states:

## INTRODUCTORY STATEMENT

1.  This is a civil action seeking money damages in excess of $75,000.00 on behalf of

Plaintiff Terry Harrington ("Harrington") and Plaintiff's daughter Nicole Antoinette Harrington.

Counts 1 and 2 assert 42 U.S.C. § 1983 claims against all Defendants for violations of Plaintiff

Terry Harrington's constitutional rights under the First, Fourth, Fifth, Sixth, and Fourteenth

Amendments to the United States Constitution.  Count 3 asserts 42 U.S.C. § 1985(3) conspiracy

claims against all Defendants for violations of Plaintiff Terry Harrington's constitutional rights

under the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States

Constitution.  Counts 4 and 6 assert State claims against all Defendants that are so related to

Counts 1, 2, and 3 that they form part of the same case presented by Counts 1, 2, and 3.  Count 5

asserts a State claim against Defendants Pottawattamie County, City of Council Bluffs, Larsen,

Brown, and John Does One through Nine that is so related to Counts 1, 2, and 3 as it forms part

of the same case.  All Counts involve opposing parties who are citizens of different states.

2.  The Court has original jurisdiction of Plaintiff's federal causes of action that properly

invoke this Court's subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332, and 1343 and 42

U.S.C. §§ 1983 and 1985(3) and supplemental jurisdiction over Plaintiff's State claims under 28

U.S.C. § 1367(a).

3.  Venue is proper in this Court under 28 U.S.C. § 1391(a) as a substantial part of the

events and omissions giving rise to the claims asserted herein occurred in Pottawattamie County,

Iowa, which is in this district and division.

4.  This complaint is timely filed within the applicable statute of limitations. The

appropriate statute of limitations is Iowa's two-year statute for personal injury claims.  Iowa

Code § 614.1(2) (2005). The United States Supreme Court and the Eighth Circuit have held that

42 U.S.C. § 1983, which does not contain a statute of limitations, adopts the relevant statute of

limitations for personal injury actions. *Wilson v. Garcia*, 471 U.S. 261 (1985); *Wycoff v. Menke*,

773 F.2d 983, 984 (8th Cir. 1985) (holding that Chapter 614 of the Iowa Code applies to 42

U.S.C. § 1983 claims). The Iowa Supreme Court vacated Harrington's conviction and granted

him a new trial on April 18, 2003, and on October 24, 2003, the State of Iowa dismissed without

prejudice the charge against Defendant Terry Harrington for the murder of John Schweer. *See*

*Heck v. Humphrey*, 512 U.S. 477, 489-90 (1994) ("a § 1983 cause of action does not accrue until

the conviction or sentence has been invalidated.").

## PARTIES

5. Plaintiff Terry Harrington is a citizen of the United States and of the State of

Nebraska. He brings this suit on his own behalf and on behalf of his daughter Nicole Antoinette

Harrington.

6. Nicole Antoinette Harrington is the daughter of Plaintiff Terry Harrington and is a

citizen of the United States and the State of Minnesota. Plaintiff Terry Harrington is required by

the laws of the State of Iowa to bring the claim alleged herein on her behalf as her claim is for

the loss of parental consortium of her father Plaintiff Terry Harrington. *See Audubon-Exira*

*Ready Mix, Inc. v. Illinois Cent. Gulf R.R. Co.*, 335 N.W.2d 148 (Iowa 1983).

7. Defendant Pottawattamie County is a duly existing county under the laws of the state

of Iowa.

8. Defendant City of Council Bluffs ("Council Bluffs") is a municipality duly

incorporated under the laws of the state of Iowa.

3

9. Defendant Dave Richter ("Richter") is a citizen of the State of Iowa currently residing in Pottawattamie County. In 1977-78 he was the County Attorney for Defendant Pottawattamie County and was personally involved in the investigation and prosecution of Harrington for Schweer's murder, and he is sued in his individual and official capacities.

10. Defendant Joseph Hrvol ("Hrvol") is a citizen of the State of Iowa currently residing in Pottawattamie County. In 1977-78 he was an Assistant County Attorney for Defendant Pottawattamie County and was personally involved in the investigation and prosecution of Harrington for Schweer's murder, and he is sued in his individual and official capacities.

11. Defendant Daniel C. Larsen ("Larsen") is a citizen of the State of Iowa currently residing in Pottawattamie County. In 1977-78 he was a detective in the Police Department of Defendant City of Council Bluffs, Iowa and was personally involved in the investigation of the Schweer murder, and he is sued in his individual and official capacities.

12. Defendant Lyle W. Brown ("Brown") is a citizen of the State of Iowa currently residing in Pottawattamie County. In 1977-78 he was a detective in the Police Department of Defendant City of Council Bluffs, Iowa and was personally involved in the investigation of the Schweer murder, and he is sued in his individual and official capacities.

13. The true names and capacities of John Does One through Nine are presently unknown to Plaintiff. Plaintiff is informed and believes, and based on such belief alleges, that each of said John Does is or was at times relevant hereto a citizen of the State of Iowa and responsible for the damages suffered by Plaintiff Terry Harrington and his daughter Nicole Antoinette Harrington. Leave of court will be sought to amend this complaint to include the true names and capacities of the John Does as soon as such information becomes know to Plaintiff.

4

## FACTUAL ALLEGATIONS AS THEY APPLY
## TO ALL COUNTS

### Retired Police Captain John Schweer found dead

14. On or about July 5, 1977, John Schweer ("Schweer") retired from the Council Bluffs, Iowa Police Department as a Captain.

15. On or about July 12, 1977, Schweer went to work as a night security guard for three car dealerships in Council Bluffs: McIntyre Oldsmobile; Bluffs Toyota; and O'Neill Datsun. The three dealerships had common ownership and were located near the intersection of 32nd Avenue (running East and West) and South 11th Street (running North and South) in Council Bluffs.

16. McIntyre Oldsmobile was on the southeast corner of 11th Street and 32nd Avenue. The AWDI warehouse was directly across 32nd Avenue from McIntyre Oldsmobile on the northeast corner of the intersection. O'Neill Datsun was to the east of the AWDI warehouse on the north side of 32nd Avenue.

17. At about 9:30 a.m. on Friday, July 22, 1977, Schweer's body was found on the railroad tracks that ran north-south between the AWDI warehouse and O'Neill Datsun, about 150 yards north of 32nd Avenue.

18. Schweer died of a shotgun wound to the right chest.

19. Authorities concluded that the murder weapon was a 12-gauge shotgun. A live 12-gauge shotgun shell was found at McIntyre Oldsmobile. This was a green Remington paper shotgun shell containing #4 size shot. The pellets found in Schweer's body were also #4 size shot.

20. The live shell found at McIntyre Olds had paper wadding.  Similar paper wadding was also found at the murder scene.  Remington had stopped using paper wadding in about 1966, about 11 years before the Schweer murder.

**The 1977-78 investigators**

21. The murder of John Schweer was highly publicized in the local media and there was intense public pressure on the Council Bluffs Police Department and the Pottawattamie County Attorney's Office to arrest and convict someone for that crime.

22. The murder of a retired police officer was of special significance to the Council Bluffs Police Department and the Pottawattamie County Attorney's Office.  For the first few days, virtually the entire Council Bluffs Police Department worked on the case.

23. Defendants Brown and Larsen were detectives with the Council Bluffs Police Department at the time of the Schweer murder.  Brown and Larsen were the lead investigators working on the case from July 22, 1977 through the criminal trials in 1978.

24. County Attorney Richter and Assistant County Attorney Hrvol worked closely with Brown, Larsen, and the rest of the Council Bluffs Police Department during the investigation of Schweer's murder.  Both participated in witness interviews before any arrests were made.

25. Richter and Hrvol had access to all of the reports generated during the Schweer murder investigation.

26. The police investigation included participation from the Pottawattamie County Attorney's office — particularly the well-documented participation by County Attorney Richter and Assistant County Attorney Hrvol.

27. The early stages of the murder investigation involved more than a dozen suspects, none of whom included Harrington or Curtis McGhee ("McGhee").

28. From the beginning of the investigation the police had focused their investigation on finding a man with a dog based on physical evidence and witness statements.

**Early leads**

29. Early in the Schweer investigation, defendants learned — as documented in a police report withheld from Harrington — that, on or about July 20, 1977 at 12:30 a.m., Schweer had written a note to McIntyre Oldsmobile employee David Edwards:

> Dave: If you get a chance, talk to Tim O'Niel [O'Neill] at Datsun Mt [Motors]. Ask him if he would install or put in flood lights in the car lot on the West side of his building, where he keeps his trucks parked. I chased a man out of there last night. It appeared that he was trying to get in to one of the trucks. When I approached him he ran north West in to the weeds and I lost him. Lights would sure help in this area. Schweer.

30. Defendants also learned early in the investigation that Schweer had a conversation — as documented in a police report withheld from Harrington — with Council Bluffs Police Officer Ron Cady at 3-4 a.m. on July 21, 1977 in which Schweer told Cady that he had seen a man at O'Neill Datsun he thought was carrying a rifle or a car jack. Schweer also told Cady that he thought the man was still hiding in the area at the time of their conversation. The report also documented that Schweer sighted a dog in the area that he thought belonged to the man with the rifle.

31. Schweer's body was found near the area where he had asked that O'Neill Datsun install floodlights. There were high weeds nearby. The location of Schweer's vehicle with the lights on and door open is consistent with his using the vehicle's lights as a substitute for those floodlights.

**Footprints and dog prints**

32. Plaster casts of footprints and dog prints were taken in the area around Schweer's body.

33. On or about July 23, 1977, Council Bluffs Police Officer Richard Moore ("Moore") reported that he and Officer O.G. Chapin also found shoe and dog prints where 11th Street dead-ended at I-29 to the west of where Schweer's body was found. Moore's police report states that these shoe and dog prints were of the same type and shape as those found at the crime scene. Moore's report also states that a fit person could get from the murder scene and completely across I-29 in four minutes at this location.

34. Because Defendants withheld this information, Harrington's trial attorney did not have an opportunity to review the human footprint and dog print plaster cast evidence to support Harrington's defense.

**James Burke**

35. On about July 25, 1977, Brown wrote a report — withheld from Harrington — of an interview with James Burke ("Burke"), an employee at the Northwestern Bell office located on the west side of 11th Street south of I-29 and about due west of where Schweer's body was found.

36. Brown's report reflects that Burke told police he had seen a man of average build running from the east to the west between the Northwestern Bell building and I-29 on July 19, 1977 at about 11:30 p.m. The report states that Burke also said the man was wearing overalls, carrying a shotgun, and had a dog with him.

37. A July 28, 1977 report — withheld from Harrington — authored by Council Bluffs

8

Police Sergeant Larry Williams reflects that he and County Attorney Richter reinterviewed Burke and obtained information consistent with what Brown reported.

38. Burke has stated that he told police that he saw the running man with the dog and shotgun on the night of the murder because he learned of the murder the next day and contacted police that same day.

39. Burke was never listed or called as a witness at either Harrington's or McGhee's trials.

### The suspect Charles Richard Gates

40. Larsen testified that Charles Richard Gates ("Gates") immediately came into the scope of the investigation when someone mentioned that a man with a dog had been seen in the area of the murder.

41. Gates was a Caucasian male about 47 years of age at the time of the Schweer murder. Upon information and belief, Gates's sister, Marcella Oamek, was married to a Captain on the Council Bluffs Fire Department.

42. Gates was known to carry a shotgun while walking his dogs.

43. A police report states that Council Bluffs officers questioned Gates a few days after the murder, but there is no report of the details of that interview. The report that has been found states that officers "checked" Gates's residence, but there is no record of what that entailed or what was discovered.

44. A July 28, 1977 police report — withheld from Harrington — reflects that Council Bluffs police along with County Attorney Richter interviewed David Waide ("Waide"). The report states that Waide was shown a photograph of Gates and positively identified Gates as the

9

man he had seen walking dogs in the area. Police noted that Waide had last seen Gates on July 19, 1977, however, Waide insists that this is an erroneous notation and that he had seen Gates the night of the murder.

45. James Burke was not shown a photograph of Charles Gates before the 1978 murder trials in the Schweer case.

46. Another report — withheld from Harrington — dated July 28, 1977, reflects that Council Bluffs Police Officer L.L. Diamond and Assistant County Attorney Hrvol canvassed the neighborhood near the scene of the murder. A Mrs. Shea told them that she had seen a man in overalls and a hat walking dogs. The police report states that she gave a "perfect description of Gates, a previous suspect in case." The report also states that a Mrs. Akins gave a statement that "concurs exactly" with the information provided by Mrs. Shea, and that she had seen the man as recently as July 22, 1977.

47. Larsen did a background check of Charles Gates and wrote a report regarding this work on August 12, 1977. Larsen visited an Omaha neighborhood where Gates had once lived. According to Larsen's report, former neighbors of Gates described him as a "spooky type individual." He constantly walked his three dogs that "appeared as though they could have been extremely mean." Larsen reported that the neighbors said he was "strictly a loner" who was never seen with other people.

48. A former landlord of Gates told Larsen that he had found a ball of chewing gum twice the size of a softball in the house after Gates vacated the premises. There was also an old refrigerator in the backyard. A window had been installed in the refrigerator door and Christmas lights and a child's chair could be seen inside the appliance. A coffee pot had been screwed on

top. Larsen's report states that the landlord said the refrigerator "looked like some sort of an outer space gadget."

49. Larsen's report also indicates that Gates drove a white car that had been painted to look like a police vehicle. The fenders had been painted black. There were Strongheart brand dog food emblems on the front car doors along with the words "Iowa Environmental Security Commission." The car had a roof rack that had been outfitted with a set of "top lights consisting of backup or turn signal type lights made for larger type trucks" which gave the appearance of lights on a police car.

50. Larsen also learned that Gates had been a suspect in the 1963 homicide of a female co-worker at a printing company in Omaha. Larsen's report states that he reviewed Omaha Police Department reports in that 1963 case and that "in the report indications are made that GATES acted in a very suspicious manner while employed at the printing company and that his actions towards women indicated something of an unnatural form."

51. Larsen had found Gates sleeping in his car (sometime before the Schweer homicide) and arrested him on a vagrancy charge. Larsen photographed Gates. Larsen also photographed the contents in the car, which included a life-size doll dressed like a child with balloon breasts, faux fur in the pelvic area, and a hole drilled in the doll of the appropriate size for insertion of an adult-sized penis. No record of this report has ever been found.

52. In 2003, Council Bluffs police reviewed the Omaha Police Department's records regarding the 1963 murder. There was a report in that 1963 file regarding a records check on Gates "which indicated 'Safe Keeping' in connection with Assault with Gun (Mental) dated 6-22-55." Larsen's August 12, 1977 report indicated that he had reviewed the same Omaha police

report regarding the 1963 homicide.

53. Larsen also wrote in his August 12, 1977 report — withheld from Harrington — that "suspect, GATES, Charles R. had been given a polygraph examination by Confidential Polygraph Service, Omaha, Nebraska and it was the written opinion contained as an addendum to this report under heading 'Test Results' that suspect GATES was not truthful in his denial of owning a shotgun or having shot John Schweer." The written polygraph report has never been disclosed.

54. Because Defendants withheld it, Harrington's trial attorney did not have an opportunity to review the Gates polygraph report.

55. An astrologer volunteered to help the County Attorney's Office after learning that a reward was being offered for help in solving the Schweer murder case. She met with Larsen, Richter, and Hrvol in the County Attorney's Office. Larsen's police report reflects that she was given the date of birth of Gates, "one suspect in the matter," to do an astrological chart.

56. In his August 12, 1977 report, Larsen recommended further investigation of Gates, including where he had lived and worked. Larsen also recommended that local mental institutions be contacted. There is no record that any of this was done.

57. There is no document generated (or, if generated, produced) during the investigation of the Schweer murder, or afterwards, that indicates whether any search was conducted for a shotgun at Gates's home, his automobile, or at any other place where Gates might have kept a shotgun. There is also no document generated (or, if generated, produced) during the investigation of the Schweer murder, or afterwards, that indicates why such a search was not done.

58. There is no document generated (or, if generated, produced) during the investigation of the Schweer murder, or afterwards, that indicates whether any attempt was made to compare the footprints taken at the murder scene with Gates or any other suspect.

59. There is no document generated (or, if generated, produced) during the investigation of the Schweer murder, or afterwards, that indicates whether any attempt was made to compare the dog prints taken at the murder scene with Gates's dogs.

60. There is no document generated (or, if generated, produced) during the investigation of the Schweer murder, or afterwards, that stated any reason for eliminating Gates as a suspect.

61. Detective David Dawson took a taped statement from Gates on or about April 25, 2003.

62. During his April 25, 2003 interview, Gates admitted that he possibly walked dogs in the area of the murder during the time frame surrounding the murder.

63. On April 25, 2003, Dawson asked Gates if he ever wore overalls back in 1977. Gates responded that he "couldn't come up with that." Dawson then indicated to Gates that he was asking because a witness in the Schweer murder case back in 1977 had been shown his photograph and identified him as a person he had seen wearing overalls. Gates then responded that he never wore bib overalls and that he hated them.

64. On April 25, 2003, Dawson asked Gates if he had any idea where he was on the night of the Schweer murder. Gates said "that's deep" but gave no answer. He also could not recall whether he told police back in 1977 where he was that night.

**The suspect Gates is abandoned in favor of a north Omaha teen "car theft ring"**

65. On or about September 1, 1977, two cars were stolen from dealerships in Fremont,

13

Nebraska: a 1977 Cadillac De Ville from Sid Dillon Oldsmobile and a 1976 Lincoln from Diers Ford.

66. The suspects were three African-American youths driving a black Oldsmobile Cutlass Supreme with Douglas County, Nebraska license plates. Police believed that the thieves visited the dealerships during business hours; took the keys from the cars and replaced them with "dummy" keys to cover the thefts; and then returned after hours to steal the cars.

67. On or about September 5, 1977, the Nebraska State Patrol contacted the Council Bluffs police with information on the car thefts in Fremont, Nebraska.

68. Larsen checked Council Bluffs Police Department records and found that a black Cutlass was reported stolen from Bluffs Toyota shortly before Schweer started working as a night watchman.

### The Fremont cars are recovered

69. The Lincoln automobile stolen from Fremont was found abandoned in Omaha on or about September 5, 1977. A T-shirt was found in the car with "Contact Band" written on the front and "Jones" on the back.

70. On or about September 9, 1977, Lincoln, Nebraska police stopped three African-American teenagers in the Cadillac stolen from Fremont's Sid Dillon Oldsmobile. They were identified as Kevin Mack, 16; Roderick Jones, 17; and Candace Pride, 16, all of Omaha.

71. Jones told police in Lincoln, Nebraska that he was in the Contact Band and that the T-shirt found in the Lincoln was his.

### Kevin Hughes, a/k/a "Kevin Mack," among others

72. "Kevin Mack" was really Kevin Hughes ("Hughes") *[he will be referred to as Kevin*

14

*Hughes in this complaint]*. Although he was only 16 years of age, Kevin Hughes had used

several aliases. These included Kevin Mack, Kevin George, Kevin Jackson, Ronald Jackson,

and Jerome Jackson. He used these aliases because of his long criminal record under his real

name of Kevin Hughes.

73. Hughes denied that he stole the Cadillac he was caught driving. He told Fremont

police that Harrington, Anthony Houston ("Houston") and a person named "Cub" had stolen the

cars in Fremont. Hughes was reported to have said that these three individuals also stole the

black Cutlass from Council Bluffs and another Lincoln from Metro Motors in Omaha. Hughes

told police that he was driving the Cadillac with Houston's permission. He also indicated to

police that the other sets of keys found in the Cadillac belonged to the real car thieves, not him.

74. Defendants later learned that McGhee's nickname was "Cub."

75. The Council Bluffs Police Department was notified of the arrests in Lincoln and

advised that Hughes may have information on the Schweer murder. Larsen and Brown traveled

to Lincoln to interview Hughes in connection with the Schweer case.

76. The Defendants were desperate to charge and convict someone for the murder of

retired Police Captain Schweer. They needed a witness to do it, and Hughes was a perfect

candidate because he was young, poor, African-American, and in trouble.

77. The Defendants told Hughes they knew he was involved in the car theft ring and that

they knew that he and his fellow car thieves were responsible for the Schweer murder. They told

him that he would be charged with the murder unless he could give them someone else. They

told him that he would not be charged with the murder if he did so.

78. Defendants also told Hughes that there was a $5,000 reward for information leading

to the arrest and conviction of Schweer's killers.

79. Hughes also had other legal problems, including not only the Fremont thefts and his possession of the stolen Cadillac in Lincoln, but also multiple burglary and robbery charges in Omaha. Defendants told Hughes that they could help him with those charges if he worked with them on the Schweer case.

80. Hughes was very afraid of being charged with the murder of John Schweer. He was willing to say whatever Defendants wanted him to say to avoid a murder charge. He was also motivated by Defendants' offers of a $5,000 reward and help with his legal problems.

81. Hughes proceeded to tell a series of lies to save himself from murder charges in the Schweer case and to obtain reward money and leniency for his own crimes.

**Hughes first lies that a "light-skinned man" murdered Schweer**

82. First, Hughes told Larsen and Brown that he saw a Dennis Jackson and a "light-skinned man" at a car wash in Omaha. The "light-skinned man" was later identified as Steven Frazier ("Frazier"). Hughes said that Frazier told him he had stolen his Lincoln Continental from McIntyre Oldsmobile and had to kill the security guard to get it. Hughes gave a written statement to Larsen and Brown containing this story.

83. Larsen and Brown knew that Hughes was lying. No Lincoln was stolen from McIntyre Oldsmobile on the night of the murder. They told Hughes that they knew he was lying, and that this made him a stronger suspect for the murder himself.

84. The other Defendants were also aware of Hughes's false "light-skinned man" story.

**Hughes lies about Arnold Kelly murdering Schweer**

85. Hughes also provided false statements and information to investigators that Arnold

Kelly ("Kelly") was the person who murdered Schweer.

86. Subsequent police investigation determined that Kelly was enrolled in the Job Corps in Kansas City at the time of Schweer's murder and could not therefore have committed the murder as stated by Hughes.

87. The other Defendants were also aware of Hughes's false accusation of Kelly as the person who murdered Schweer.

### Hughes next lies that Harrington and others told him they killed Schweer

88. Police and prosecutors all wanted to solve the murder of retired police officer John Schweer. Those interviewing Hughes in connection with his car thefts and other crimes knew that Hughes had accused Harrington, McGhee, and Houston of stealing the black Cutlass from one of the Council Bluffs dealerships where Schweer worked. They pressed Hughes to accuse the same three teenagers of the Schweer murder.

89. Initially, Hughes told investigators that he did not think they were capable of killing someone, but he eventually relented under their pressure and changed his story. An Omaha Police Department report indicates that Hughes initially said that he personally was not involved, but rather that Harrington and others told him that they had killed Schweer. Omaha police officers told Hughes that they thought he was lying about Harrington, McGhee, and Houston killing Schweer, and he admitted it.

90. The Defendants were aware of this Hughes story as well as his admission that it was false.

### Defendants use Hughes to frame Harrington and McGhee

91. Hughes then told Omaha police on or about September 30, 1977 that he was present

on the night of the murder. But his story was confused, and they brought him to Council Bluffs to meet with the Defendants at the scene of the crime.

92. The Defendants knew that Hughes was a liar. But they were desperate to give the appearance of solving the Schweer case. They "worked with" Hughes to create a case against Harrington and McGhee by editing Hughes's story to eliminate the lies that were demonstrably false and by providing him with details of the crime to make him seem more credible.

93. Hughes has admitted under oath that the story he told against Harrington and McGhee was false, and that he gave this false testimony due to Defendants' threats of murder charges, offers of reward money, and promises to help him with his other criminal charges. Hughes would not have agreed to implicate himself in the Schweer murder had the Defendants not assured him that he would not be charged with murder if he did so.

94. Hughes has also admitted that the Defendants fed him many of the "facts" in his story against Harrington and McGhee. He has admitted that the Defendants brought him to the crime scene several times to better construct his false story, and that they talked to him "too many times to count" to put that story together.

### Hughes lied that Anthony Houston was one of the murderers

95. In his September 30, 1977 statement to Omaha police, Hughes said that he went to McIntyre Oldsmobile on the murder night with his cousin, Houston, as well as Harrington and McGhee.

96. The Defendants were aware of Hughes's statement about Houston's involvement to Omaha police. Hrvol, Larsen, and Brown went to the Nebraska State Patrol headquarters in Lincoln, Nebraska to interview Houston. Houston told them that he was in the Douglas County

jail at the time of the murder.  Defendants contacted the Douglas County jail and confirmed that

Houston was telling the truth.

97. Defendants told Hughes that Houston could not have been present for the Schweer

murder. Hughes adopted their suggestion and dropped Houston from his story.  From that point

on, his story was that only Harrington and McGhee were with him on the murder night.

**The murder weapon**

98. Hughes first said that Schweer was killed with a pistol.  Defendants told Hughes that

Schweer was killed with a shotgun.  Then Hughes said the murder weapon was a 20-gauge pump

shotgun. Defendants told Hughes that it was a 12-gauge, and that they found a 12-gauge shell at

McIntyre Oldsmobile near a Toronado parked in front of the new car showroom at McIntyre

Oldsmobile. Hughes then changed his story to say that a 12-gauge shotgun was used, and that

they intended to steal the Toronado on the night of the murder.

99. The 12-gauge shotgun used to kill Schweer was never found.  Neither Harrington nor

McGhee was ever found in possession of a 12-gauge shotgun.

100. In October, Omaha police searched (with Harrington's voluntary permission)

Harrington's mother's home where he was residing and found a .410 shotgun and some shells

that Harrington admitted were his. Defendants knew that Schweer was not killed with a .410.

**Hughes's account of the murder itself**

101. After dropping Houston from his account, the story concocted by Hughes and the

Defendants was that Hughes, Harrington, and McGhee drove around the area of the Council

Bluffs car dealerships three times that night and saw no one.

102. Hughes further stated that they parked Harrington's green 1970 Olds 98 on the west

side of 11th Street south of where that street intersects 32nd Avenue. The McIntyre Oldsmobile new car showroom was directly to the east of where Hughes said they parked, on the other side of 11th Street.

103. The McIntyre showroom faced 32nd Avenue. The Toronado that they were allegedly there to steal was parked in front of the showroom, only about 50 yards away from where Hughes said they parked their car.

104. According to Hughes's story, Harrington had the keys to the Toronado. All Harrington had to do was cross 11th Street, walk over to the Toronado and drive away.

105. According to Hughes's story, he stayed at the car while Harrington took a shotgun from the trunk and, with McGhee in tow, went on foot to get the Toronado.

106. In his initial story in which he was present for the crime, Hughes had said that he was sitting in the backseat of the car listening to music while his colleagues went to get the Toronado. At the 1978 trials, he said he was sitting on the car, smoking cigarettes and listening to music during the crime.

107. In the first statement that Hughes gave in which he said he was present for the murder, Hughes said that he heard a shot and then saw Harrington, McGhee, and Houston come running back to the car from behind McIntyre Oldsmobile. He left Houston out after the Defendants told him that Houston was in jail on the night of the murder.

108. Schweer was not shot behind McIntyre Oldsmobile. His body was found on the railroad tracks by O'Neill Datsun, about 150 yards to the north of 32nd Avenue and well over 200 yards from where the Toronado was parked at McIntyre Oldsmobile.

109. Defendants fixed this problem. They tailored Hughes's false statement so that it fit

where Schweer's body was found. They had Hughes change his story to be that, when Harrington and McGhee left the car, they headed more toward where Schweer's body was found than toward the "target Toronado" parked in front of McIntyre Oldsmobile.

110. They also had Hughes say that, after the shot, he saw Harrington and McGhee running back to the car from behind the AWDI warehouse that sat directly across from McIntyre Oldsmobile on the north side of 32nd Avenue. The Defendants made this change because a person might run west from the murder scene on the north side of the AWDI warehouse and then south on 11th Street to return to the location where Hughes said the Olds 98 was parked.

111. Defendants knew this made no sense. There was no reason for Harrington and McGhee to have gone to where Schweer was murdered when all they had to do was cross 11th Street to steal the "target" Toronado.

112. There was no evidence that Schweer came upon Harrington and McGhee during the attempt to steal the Toronado. Schweer's Toyota Land Cruiser was found at O'Neill Datsun near where his body was found with the lights on and the door open. If Schweer had startled Harrington and McGhee while they were trying to steal the Toronado, Schweer would have possibly had to drive his Toyota Land Cruiser right by the car where Hughes was sitting.

113. In none of Hughes's statements did he ever say that he saw or heard Schweer or his vehicle during Harrington and McGhee's alleged attempt to steal the Toronado.

114. In none of Hughes's statements did he ever say that Harrington or McGhee told him that Schweer had come upon them during their alleged attempt to steal the Toronado.

115. In McGhee's trial, Hughes testified that the shotgun used to kill Schweer was placed under the front seat of the car after the murder.

116. In Harrington's trial, Hughes testified that the shotgun used to kill Schweer was placed crosswise on top of the front seat of the car after the murder.

**Harrington's jacket**

117. In a September 30, 1977 statement to Omaha police, Hughes said that Harrington put his *tan* leather jacket over the shotgun before heading off to steal the Toronado. Defendants were aware of this statement during their work on the Schweer murder case and it was incorporated in their story.

118. In October, Omaha police searched (with Harrington's voluntary permission) Harrington's mother's home where he was residing and seized a *reddish-maroon*, vinyl jacket.

119. Hughes never identified the jacket seized by Omaha police as the jacket he saw Harrington put over the shotgun on the night of the murder.

120. At some point after October 26, 1977, Council Bluffs police gave the jacket that Omaha police seized from Harrington to the Iowa Bureau of Investigation laboratory to be tested for gunpowder residue. This was more than three months after the murder.

121. Michael Petersen, the Iowa Bureau of Investigation technician who examined the jacket, found no evidence that the jacket had been wrapped around a fired shotgun.

122. Debris from the surface of the jacket and its pockets were examined under a microscope. Two particles were tested and Petersen concluded that they were of unburned, smokeless gunpowder.

123. The particles were destroyed by the testing. Neither Harrington nor McGhee could have their own testing done to confirm or deny these results.

124. Petersen's 1977 report described the particles as "form unrecognizable." He has

testified under oath that different types of gunpowder are used in shotguns, rifles, and pistols and that he could not say whether the particles were consistent with shotgun, rifle, or pistol gunpowder.

125. No attempt was made to compare the particles with the specific powder in the 12-gauge shell found at McIntyre Oldsmobile after the murder, or with any gunpowder found on the victim.

126. Defendants made no attempt to rule out that the particles of gunpowder were related to Harrington's use of his .410.  Defendants knew that Schweer was not killed with a .410.

127. The only "evidence" that tied these alleged flakes of gunpowder from Harrington's jacket to the Schweer murder was the false testimony of known-liar Hughes.

128. Hughes has testified under oath that he made up the story about Harrington and McGhee shooting Schweer, including the part about Harrington putting his jacket over the shotgun.

**Defendants created "corroboration" of part of Hughes's story: 24th and Pratt**

129. Defendants knew that they needed other witnesses to "corroborate" at least some of the false story they manufactured with Hughes.  They knew that Hughes had severe credibility problems and, under the Iowa Code at that time, a person could not be convicted solely on the basis of an accomplice's testimony.

130. In the course of their investigation of the Schweer murder, Defendants Larsen, Brown, John Does One through Nine, Richter, and Hrvol solicited and procured through intimidation, coercion, threats of prosecution, undisclosed promises of leniency, and other coercive and unlawful means, the testimony of Roderick Jones ("Jones"), Clyde Jacobs

23

("Jacobs"), Linda Lee ("Lee"), and Candace Pride ("Pride") to provide statements and trial testimony against Harrington rebutting the testimony of the numerous alibi witnesses for Harrington that Harrington was with them at the time of Schweer's murder and corroborating Hughes's testimony to the extent that Harrington was with Hughes at a time shortly before the State of Iowa alleged Schweer was murdered.

131. Defendants amended Hughes's account to insert other persons into the story and then threatened and pressured those persons — other frightened teenagers — with charges of murder and other crimes to induce them to give false testimony to "corroborate" Hughes.

132. This effort began with the place that Hughes said Harrington and McGhee picked him up in Omaha before the murder. Initially, Hughes told authorities that he was watching television with Pride at her house on the night of the murder. He then said that he was alone when Harrington, McGhee, and Houston picked him up for the trip to Council Bluffs.

133. Defendants changed Hughes's story to be that Harrington and McGhee picked him up at a parking lot at 24th and Pratt in Omaha that night with others present so that those teens could testify that they saw Harrington and McGhee pick Hughes up.

134. The day before Hughes gave this November 16, 1977 statement that implicated Harrington in the Schweer murder Hughes went to the murder scene area with representatives of the county attorney's office.

135. Hughes testified that both police and prosecutors, together, had brought him to the murder scene several times to concoct and fabricate a story that implicated Harrington.

136. It was too many times for Hughes to count the number of times that the police and prosecutors, including Larsen, Richter, and Hrvol by name, talked to him about the shooting and the physical evidence.

137. Richter talked to Hughes before Hughes's 1978 trial testimony and told Hughes that Harrington claimed he was at Peony Park at a concert at that time and that Harrington could not have been with Hughes at 11:00 o'clock and that time is a factor in this case.

138. Hughes testified that after this, the three men stopped at Hughes' girlfriend's house (Lee) until about 1:30 a.m., before returning to 24th and Pratt, where Hughes separated to go to his other girlfriend's house (Pride).

139. In a November 16, 1977 taped statement to County Attorney Richter with Hrvol, Larsen and Brown present, Hughes said that he was with Pride, Jones, and some others when Harrington and McGhee picked him up at 24th and Pratt. He later added that Jacobs was there too.

140. Hughes was also willing to accept the Defendants' coaching on the time he was picked up. In his November 16, 1977 statement, he said Harrington and McGhee picked him up around 11 p.m.

141. After being charged, Harrington presented an alibi defense that he was at an Ohio Players concert at Peony Park in Omaha at the time that Hughes said he was picked up at 24th and Pratt. Harrington's witnesses included his high school football coach, Carl Wright, who saw Harrington at the concert and testified as to this at Harrington's 1978 trial.

142. The Defendants attempted to intimidate two of these witnesses, Thea Scott and Carl Wright, because their testimony conflicted with the false story they had concocted to convict

Harrington and McGhee.

143. Hrvol, Brown, and Larsen confronted Thea Scott and accused her of lying on Harrington's behalf. They attempted to persuade her not to be a witness and suggested she would ruin her life if she testified, and she was untruthfully told that she had failed a polygraph examination.

144. Thea Scott felt threatened by Hrvol's statement "this is serious shit." Despite these threats, Thea Scott testified in support of Harrington's alibi as expected. She brought the matter to the trial court's attention through Harrington's trial counsel and the judge chastised Hrvol for his action.

145. Defendants also had Hughes move back the time that he was picked up at 24th and Pratt to meet Harrington's alibi. Hughes testified at Harrington's trial that Harrington and McGhee picked him up around midnight, not at 11 p.m. as he had said in his November 16, 1977 statement.

### Roderick Jones

146. Roderick Jones was a 17-year-old African-American living in north Omaha in 1977. He had been caught riding in the stolen Cadillac with Hughes and Pride in Lincoln, Nebraska. He was in the Contact Band musical group, and his band T-shirt was found in the Lincoln automobile stolen from Fremont.

147. Larsen wrote a report on October 17, 1977 indicating that Jones admitted being with Hughes on several occasions where the key-switch system was used to steal cars from dealerships.

148. Brown told Jones that they knew that Harrington, Hughes, and McGhee had killed

Schweer.  Brown told Jones to say that he saw Harrington, Hughes, and McGhee together on the night of the murder.  If he did not, they would charge him with stealing cars and with the Schweer murder.

149. Jones was frightened and agreed to lie and tell the story the police wanted because of these threats.  The other Defendants were aware of these threats and made similar threats to Jones to procure his testimony against Harrington and McGhee.

150. Brown put Jones in a room with Hughes at the Omaha Police Headquarters so they could get their stories straight.  In his taped statement after speaking with Hughes, Jones said that everything he knew came from Hughes.  He said he was at 24th and Pratt with Hughes and Jacobs.  At the 1978 criminal trials, he said that Pride was also there because Defendants had also added her to their list of "corroborating" witnesses by that time.

151. Jones also said in this taped statement that Harrington and McGhee picked Hughes up at 24th and Pratt on a night in the last part of July.  At McGhee's 1978 trial, Jones testified it was sometime in the middle of July.  At Harrington's 1978 trial, Jones was more specific and said that he saw Harrington and McGhee pick up Hughes at 24th and Pratt on the evening of July 21, 1978.

152. Jones was also flexible to suit the Defendants' needs on the time that Harrington and McGhee allegedly picked Hughes up at 24th and Pratt.  In his original statement, he said it was around 11:30.  At McGhee's 1978 trial, he testified it was around 11 or 12.  At Harrington's 1978 trial, he said he was at the same Peony Park concert as Harrington, and that he saw Harrington and McGhee pick Hughes up at 24th and Pratt at around 12 or 12:30.

153. There is no record of Jones telling anyone that he was at the Peony Park concert

before he gave this testimony at Harrington's trial. Defendants coached Jones to say he was at that concert so they could claim Harrington could have been at the concert and still have picked up Hughes at 24th and Pratt.

154. In exchange for his false testimony at the McGhee and Harrington trials, Jones was not charged with his involvement in any car thefts or murder.

155. Jones has stated that he lied in 1978 due to the Defendants' threats to charge him with the Schweer murder and car thefts.

**Clyde Jacobs**

156. Clyde Jacobs was a 17-year-old African-American living in north Omaha. Larsen, Brown, and Hrvol came to Omaha several times and brought him to Council Bluffs for questioning, sometimes with Jones and Pride present so they could get their stories straight. They told Jacobs that they knew he was in the car theft ring and that he would be charged with Schweer's murder if he did not say what they told him to say.

157. Jacobs was young and scared. He was stealing cars with Hughes and Jones. He agreed to testify falsely to what these Defendants told him to say because of these threats. Defendants were aware of the threats made to Jacobs to secure his false testimony and made similar threats to Jacobs themselves.

158. In his original statement, Jacobs had said that Harrington and "another colored guy" picked up Hughes. He did not name McGhee.

159. With Defendants' coaching, Jacobs testified at McGhee's trial that McGhee was with Harrington when Hughes was picked up at 24th and Pratt.

160. At McGhee's trial, Jacobs testified that Harrington and McGhee picked Hughes up

at "12 something." At the Harrington trial, he said they picked him up at 24th and Pratt at "11 something." Like Jones, Jacobs first mentioned that he had been at the Peony Park concert at the Harrington trial.

161. In return for his false testimony, Jacobs was not charged with car theft or murder.

162. Jacobs has twice admitted under oath and subject to penalty of perjury that his 1978 testimony was false.

163. Jacobs testified in Harrington's 2000 post-conviction review proceedings that several times a week for about a month's duration police picked him up and took him to the police station to make perfectly clear that his, Pride's, and Jones' stories were right and that they were perfectly together on the stand.

**Candace Pride**

164. Candace Pride was a 16-year-old African-American living in north Omaha. Hughes was her boyfriend in the fall of 1977. Hughes told her that she needed to corroborate his false story implicating Harrington and McGhee or he would be charged with murder.

165. Larsen and Brown came to take Pride's statement in October 1977. They knew that Hughes's story was false, and that Pride's "corroboration" of that story would also be false. But they reminded her that she was caught in the stolen Cadillac in Lincoln with Hughes and Jones, and they also told her that her boyfriend Hughes would be charged with murder unless she said that she saw him with Harrington and Hughes at 24th and Pratt. Pride did not want Hughes to go to the penitentiary, so she went along with the false story that the Defendants had put together with Hughes.

166. Larsen and Brown prepared a statement that Pride signed on or about October 13,

1977. It sets forth that there was a night in the latter weeks of July 1977 when she, Jones,

Hughes, and others were at the parking lot at 24th and Pratt when Harrington and McGhee

picked up Hughes.

167. The other Defendants were aware that Hughes's story was false and that Pride's

"corroboration" was also false.

168. In an April 18, 1978 statement to McGhee's lawyer before his trial, Pride stated that

she did not think she was in Omaha in July 1977; that she was not socializing with Hughes in

July 1977; and that she did not see Harrington and McGhee pick up Hughes that night.

169. At the McGhee trial, however, the Defendants pressured Pride to repeat the story

they wanted her to tell.  She acquiesced and testified that she was with Jones, Hughes, and

Jacobs at 24th and Pratt on a night in late July 1977 when Harrington and McGhee picked

Hughes up.

170. The Defendants also molded Pride's testimony on the time that Harrington and

McGhee allegedly picked Hughes up. Larsen's October 17, 1977 police report states that Hughes

told him that Pride was at 24th and Pratt when Harrington and McGee picked him up at around

10:45 p.m. That was too early to fit the Defendants' story.  At McGhee's trial, they had her say

that Harrington and McGhee picked Hughes up at 11 or 11:30.  That was too early for the

Harrington trial because of his Peony Park alibi defense.  So Defendants had Pride testify at

Harrington's trial that Harrington and McGhee picked Hughes up at 12.

171. In exchange for her false testimony, the Defendants did not charge Pride with car

theft or any other crime.

172. Pride has admitted under oath and subject to penalty of perjury that her statements

about seeing Harrington and McGhee pick Hughes up at 24th and Pratt were false.

**Linda Lee**

173. According to the Hughes story, he had Harrington and McGhee drop him off at his

girlfriend Linda Lee's house when they returned to Omaha after the murder. Lee was an 18-

year-old African-American living in north Omaha. The story was that Hughes got to Lee's about

1:30 a.m. Hughes stayed a few minutes and Lee saw Harrington's car when he left.

174. Hughes told Lee that she had to corroborate his false story to save him from murder

charges.

175. Larsen and Brown knew that Hughes's story was false, including the part about his

visiting Lee that night. But they needed her to corroborate Hughes so they could get a conviction

in the Schweer case. When they interviewed Lee in October 1977, they told her that her

boyfriend Hughes would be charged with murder unless she corroborated his story. They

prepared a statement for her that Hughes came to her house after midnight one evening "during

the later part of July." They included in the statement that Lee saw Harrington and another

African-American guy in Harrington's car waiting for Hughes that night. Lee wanted to protect

her boyfriend, Hughes, and adopted the false statement.

176. The other Defendants were aware that Hughes's story was false and that Lee's

corroboration was also false.

177. At McGhee's trial, Lee testified that Hughes came over to her house after midnight

on one occasion in July 1977. She could not say if it was early, middle or late July. She could

not say if Hughes came over before or after 1 a.m.

178. At Harrington's trial, she testified that Hughes came over after midnight twice on

the same night in July 1977. The first time was "past midnight" and the second was around 2

a.m. She did not know what day this happened. The Defendants had Lee add a second visit to

meet Harrington's alibi defense.

179. Lee has admitted that these statements about a Hughes visit or visits to her house

were false.

180. Lee stated that after Hughes got out of prison he had a lot of money, but that he

never told her where he got the money.

### Defendants coached witnesses about Harrington's car

181. Harrington had testified in his 1978 trial and consistently thereafter that he had not

been driving his own vehicle during the time period around Schweer's homicide, but that he had

rather been borrowing and driving his brother's vehicle, which was similar in style and color to

his own.

182. After having received a report about "well dressed negro males" involved in auto

thefts, Council Bluffs police officer Richard Cronk pulled over Harrington's vehicle on

September 14, 1977 to see if the vehicle was stolen. Cronk checked Harrington's identification,

but let him go and indicated that he did not match the photographs of the auto theft suspects.

183. Before the alleged sightings of Harrington's vehicle by the witnesses (who have now

recanted their stories) and by the police, Harrington's vehicle was damaged in a traffic accident

that involved only property damage.

184. Harrington engaged an attorney, Mark Kratina, to assist him in recovering from the

property damage. Kratina took photographs of Harrington's car that showed it had substantial

front-end damage.

185. Neither the witnesses who have now recanted their stories nor the police noted any damage to the sighted vehicle that they alleged belonged to Harrington.

**All witnesses save one have independently recanted their false testimony**

186. Hughes, Pride, Jones, Jacobs, and Lee and the three additional witnesses (Pierce, Plater, and Hartwell) who testified against McGhee and/or Harrington have had minimal or no contact with each other for at least twenty years before their recantations.

187. Except for a single telephone call between Jacobs and Harrington, the same holds true for any contact Hughes, Pride, Jones, and Lee have had with either Harrington or McGhee.

188. Hughes had not been offered any benefit or been threatened or coerced in any way to change his testimony.

189. Hughes had not had any direct contact with Harrington before changing his testimony.

190. Hughes decided to recant his earlier lies because "[i]t's just been on my mind. I just want to get the truth out."

**The Hughes story doesn't fit the evidence of when the murder occurred**

191. Defendants learned in the first few days after the murder that two workers at Tanksley Trucking heard a loud noise like an M-80 firecracker between 3 and 3:30 a.m. on July 22, 1977. Tanksley Trucking was located less than 200 yards from where Schweer's body was found.

192. Defendants also knew that the medical examiner's report placed the time of Schweer's injury at 4 a.m. and the time of his death at 4 a.m.

193. Defendants also had access to the pathologist, Dr. A.L. Sciortino, who did

Schweer's autopsy. Dr. Sciortino testified that Schweer died between 15 minutes and an hour after being shot. He further testified that it was "very possible" that Schweer died at 4 a.m. as stated in the medical examiner's report.

194. The story that the Defendants concocted with Hughes and the "corroborating witnesses" did not fit with the murder taking place between 3 and 4 a.m.

### Harrington is arrested, taken to Pottawattamie County, and charged with murder as an adult

195. On or about November 16, 1977, an information charging Harrington with first-degree murder for Schweer's death was filed. Upon information and belief, County Attorney Richter and Assistant County Attorney Hrvol approved the decision to arrest Harrington. Harrington was arrested in Omaha, Nebraska that same day.

196. The only "evidence" described in this document that implicated Harrington in the murder were the minutes of testimony setting forth the Hughes story.

197. Harrington was extradited to Pottawattamie County, Iowa and was incarcerated in the county jail.

198. Harrington's case was transferred to juvenile court, and the Pottawattamie County juvenile court referred Harrington's case to the County Attorney's Office for further proceedings in the criminal court.

### Defendants hide Gates to convict Harrington and McGhee with Hughes's lies

199. The Defendants knew that their whole case against Harrington and McGhee hinged on the coerced and coached statement of Hughes. No other witness placed Harrington or McGhee at the murder scene that night. They also knew that the physical evidence could only be linked to Harrington and McGhee by Hughes.

200. The Defendants also knew that Hughes had severe credibility problems despite their work with him and that a jury might reject his story if there was an alternative suspect.

201. The Defendants were concerned that Harrington and McGhee would avoid conviction by using Defendants' own reports about Gates to persuade the jury that there was reasonable doubt whether Harrington and McGhee had done the crime.

202. The Defendants concealed at least eight Council Bluffs Police Department reports from Harrington and McGhee to deprive them of material, exculpatory evidence that Harrington and McGhee could have used to defend themselves.

203. The withheld reports included the two reports that referred to James Burke's statement that he saw a man with a shotgun running with a dog in the area where the murder occurred.

204. The withheld reports included the one that referred to David Waide's positive identification of Gates as the man he had seen walking dogs in the vicinity of the murder based on a photograph he was shown by Council Bluffs police and County Attorney Richter.

205. The withheld documents included Larsen's background report on Gates that stated Gates had been a suspect in the 1963 murder in Omaha; noted the polygraph examiner had opined that Gates was not truthful when he denied owning a shotgun and shooting Schweer; and discussed the neighborhood search, Gates's car, the chewing gum ball and refrigerator, his neighbors' statements about him, and the recommended follow-up investigation that was never done.

206. The withheld reports included one stating that the County Attorney's Office and the Council Bluffs Police Department consulted an astrologer early in the Schweer investigation and

gave her Gates's date of birth so she could prepare astrological charts for him.

207. The withheld reports included the one that referred to Schweer's note to Dave Edwards at McIntyre Oldsmobile requesting that O'Neill Datsun install floodlights in the area where Schweer had run off a man who had been trying to get in one of the trucks.

208. The withheld reports included one in which Council Bluffs Police Officer Kremer reported that Gates was interviewed at the police station July 25, 1977, three days after the murder, and his residence checked.

209. The withheld reports included one in which Officer Cady spoke with Schweer on July 21, 1977, memorializing the conversation in which Schweer told Cady that he had seen a man with a gun or carjack. Schweer told Cady that he thought the man was still in the area hiding in the weeds near Tim O'Neill Datsun. Schweer also related to Cady that the dog probably belonging to the man he had seen, now hiding, was still in the area.

210. The Defendants continued to conceal information on the suspect Gates in post-conviction relief proceedings brought by Harrington and McGhee in 1987 and 1988. They also continued to conceal the means by which they had procured the false testimony against them.

211. Brown testified at Harrington's 1978 trial that there were no early-on alternate suspects and he failed to indicate that Charles Gates was ever a suspect. Brown also testified at Harrington's 1987 post-conviction review proceedings that there were no early-on alternate suspects and he failed to indicate that Gates was ever a suspect. In Harrington's 2000 post-conviction review proceedings, Brown testified that Gates was a suspect within a couple of days of the murder.

212. In discovery during Harrington's 1987 first post-conviction review hearing, his attorney James Cleary deposed Richter, Hrvol, Larsen, and Brown, and each of them denied that there were any alternate suspects.

213. In the Answer to Interrogatory No. 2 served by the State in McGhee's 1987 first post-conviction review hearing asking for the "names and addresses of all suspects in the case, why they were believed to be suspects and why they were eliminated as suspects" the State answered "[n]one known other than plaintiff" with "plaintiff" thus referring to McGhee. Hrvol assisted in answering the discovery.

214. In the Answer to Interrogatory No. 14 served by the State in McGhee's 1987 first post-conviction hearing, which asked: "[w]hat was the result of the investigation of the report of a man and a dog seen in the vicinity of McIntyre Oldsmobile a night or two before John Schweer's death?" the State averred that the "man and a dog" (Gates) was "never found or identified." Hrvol assisted in answering the discovery.

215. Gates' fingerprints have never been provided to Harrington or any of his attorneys.

216. Gates refused to provide new fingerprints during his 2003 re-interview by police.

217. Neither Harrington's trial attorney nor McGhee's trial attorney asserted a defense that would indicate either had full knowledge of the alternate suspect Gates.

218. At the time of his trial, Harrington was not aware of any evidence that pointed to Gates as an alternate suspect.

219. The undisclosed police reports **on their face** show that Detectives Brown and Larsen and prosecutors Richter and Hrvol had knowledge of the evidence pointing to Gates as a viable suspect in the Schweer homicide.

37

220. The Iowa Supreme Court noted that the State did not dispute that the evidence in question was known to the prosecution (or at least the police) during the trial. *Harrington v. State*, 659 N.W.2d 509, 522 (Iowa 2003).

### Defendants procured jailhouse snitches against McGhee and used this information against Harrington

221. Knowing the weakness of their false case, the Defendants resorted to a notorious source of false evidence: jailhouse snitches. Defendants sought out prisoners who were in jail with McGhee who would agree to falsely testify that McGhee admitted guilt for the Schweer murder in the hope of gaining leniency in their own cases.

222. The State used the false, fabricated information that McGhee either was with Harrington at the time of the murder or that McGhee was with Harrington earlier than the murder on the night of the murder in its case against Harrington, and the State also used the information that McGhee confessed to the Schweer murder to further support the denials of Harrington's subsequent review attempts.

### Ken Freeman

223. Ken Freeman was an inmate with McGhee at the Pottawattamie County jail. Larsen told him that he would not have to go back to the Iowa men's prison at Anamosa if he agreed to testify against McGhee. Freeman refused.

### Tyrone Pierce

224. Tyrone Pierce was 18 years of age and incarcerated in Pottawattamie County for burglary and car theft. He was fearful of going to the penitentiary on those charges.

225. Pierce had a history of informing on other prisoners in order to curry favor with the authorities. Before McGhee's 1978 trial, a court granted Pierce's public defender's motion to

withdraw as his counsel because Pierce was informing against the lawyer's other clients.

226. Larsen and Hrvol approached Pierce. They told him that the charges against him would be reduced if he testified against McGhee.

227. Larsen and Hrvol arranged for Pierce to be placed in a cell next to McGhee's. Pierce later gave a statement that, soon after they were placed in adjacent cells, McGhee told him that he murdered Schweer.

228. Hrvol told Pierce what to say, including that McGhee made this admission to him while they were bragging to one another about their criminal accomplishments.

229. Hrvol had met with Pierce several times in the designated client-lawyer room in the jailhouse without the presence of Pierce's lawyer.

230. Charges against Pierce were dropped after he testified at McGhee's trial.

231. Pierce admitted to Charles Reese (who was in jail with Pierce and McGhee in 1978) that he had lied at McGhee's trial. In 1988, Pierce testified under oath and subject to penalty of perjury that he lied in exchange for the promise that his charges would be dropped when he said that McGhee admitted his involvement in the Schweer murder. The Defendants knew that Pierce's statement against McGhee was false and concealed that fact from McGhee.

232. In1988, Pierce testified under oath and subject to penalty of perjury that police and prosecutors suggested some of the things that he should say in his 1978 McGhee trial testimony.

233. In 1988, Pierce testified that he felt the threat of going to prison hanging over his head and after he testified as instructed he got out of jail.

**Larry Plater**

234. Larry Plater ("Plater") was in the Douglas County, Nebraska jail awaiting transfer to

the Kearney reformatory. Larsen and Brown told him that they needed some witnesses, and that they could probably keep Plater from going to the reformatory if he testified as they wanted.

235. Plater testified at McGhee's trial that McGhee told him a couple of days after the murder that he was present when Harrington killed a police officer. Plater has testified that he expected not to go to Kearney in return for this testimony.

236. Plater has admitted under oath and subject to penalty of perjury that his testimony regarding McGhee's admission was false. The Defendants knew that Plater's statement against McGhee was false, and that it was given by an inmate who was trying to get leniency for himself, but they concealed this fact.

### Eric Hartwell

237. Hartwell has a lengthy history of offering testimony against fellow inmates in return for sentencing considerations.

238. In early 1978, Hartwell was 18 years of age and serving ten years at the Iowa men's correctional facility in Anamosa for breaking and entering. He hoped to be released after a "shock" treatment of only 90 days in prison. He contacted the Defendants from Anamosa to say that he had information in McGhee's case.

239. On April 7, 1978, Larsen and Hrvol interviewed Hartwell at Anamosa. Hartwell's signed statement of that date sets forth that McGhee had told him months earlier when they were incarcerated together in the Pottawattamie County jail that he, Harrington, and another unnamed person got a 12-gauge shotgun out of the trunk, wrapped it in a jacket, and went around to thet back of the dealership where Harrington shot the "sheriff" twice.

240. Hartwell admitted that McGhee had in his possession the True Information that had

been filed against him at the time Hartwell was jailed with McGhee, but Hartwell falsely denied looking at that document as a source of his story.

241. The prosecution theory was that only Harrington and McGhee were together when Schweer was killed. Schweer's body was not found in the back of the dealership. Schweer was not shot twice.

242. The Defendants knew that Hartwell was lying, and that he was testifying because he wanted their help to get out of jail.

243. The Defendants cleaned up Hartwell's story for McGhee's trial. At trial, Hartwell stated that his April 7 statement about another person being involved with McGhee and Harrington was a "typo."

244. On or about May 9, 1978 at McGhee's trial, Hartwell was asked on direct by Hrvol why he came to court to testify. Hartwell answered that he wanted to testify, and that he was coming back in front of the judge the 15th "to see if I get out."

245. Upon information and belief, Hartwell's sentence was reduced after he testified at McGhee's trial. The Defendants did not disclose this arrangement with Hartwell to Harrington or McGhee or their lawyers.

**Defendants concealed how they obtained their information**

246. In the Answer to Interrogatory No. 6 filed by the State in McGhee's 1987 first post-conviction hearing, which asked information about "witnesses used at trial who were promised leniency in exchange for their testimony against Curtis McGhee, and the specific promises made to each[,]" the State answered: "None." Hrvol assisted in answering the discovery.

247. Neither police nor prosecutors ever disclosed any sentencing considerations or other

deals or agreements in any of Harrington's (or McGhee's) underlying proceedings.

**Deal with Hughes never disclosed**

248. The State failed to disclose the 1978 charge that Richter filed against Hughes for conspiracy to commit auto theft — the attempted auto theft in which the State claimed Harrington shot Schweer.

249. Hughes was first charged on or about June 9, 1978, as an adult for both escape from the Christian Home and conspiracy with McGhee and/or Harrington.

250. Brown filed the preliminary information and oath charging Hughes with conspiracy to commit auto theft with the Clerk of the District Court on July 7, 1978.

251. But, Hrvol filed Hughes's Juvenile Petition, Juvenile number 11-0196, with the Clerk of the District Court on July 17, 1978 in order to change the adult conspiracy to commit auto theft charge to a juvenile charge.

252. Hrvol moved to dismiss Hughes's juvenile conspiracy to commit auto theft petition against Hughes, which the Clerk of the District Court filed on November 6, 1978.

253. As a policy, Richter had some review over determinations to charge nonroutine juvenile cases.

254. Richter and Hrvol both submitted depositions in Harrington's 2000 post-conviction review proceeding in which both stated that they did not necessarily tell Harrington's original trial counsel, Paul Watts, about the charges against Hughes, which were part of Hughes' juvenile record and thus undiscoverable by defense counsel.

**McGhee and Harrington are convicted in 1978**

255. McGhee's trial began on May 2, 1978. On May 11, 1978, the all-White jury returned

a verdict of guilty on the charge of murder in the first degree.  On June 13, 1978, McGhee was

sentenced to life at hard labor without the possibility of parole.

256. Harrington's trial began on July 25, 1978.  Like McGhee, Harrington is African-

American.  On August 4, 1978, the all-White jury returned a guilty verdict on the charge of

murder in the first degree.  On August 4, 1978, Harrington was also sentenced to life at hard

labor without the possibility of parole.

### Harrington has steadfastly maintained his innocence and tenaciously fought for the truth

257. After Terry Harrington's conviction of first-degree murder, he directly appealed the

conviction, but the Iowa Supreme Court affirmed his conviction on October 17, 1979.  *State v.*

*Harrington*, 284 N.W.2d 244 (Iowa 1979).

258. Harrington filed an application for post-conviction relief that the District Court

ultimately denied on July 13, 1988 and the denial of which the Iowa Court of Appeals affirmed

on January 25, 1990.

259. Harrington then petitioned for writ of habeas corpus, which the United States

District Court for the Southern District of Iowa denied on November 25, 1991.

260. The Eighth Circuit Court of Appeals affirmed the District Court's denial on January

8, 1993.  *Harrington v. Nix*, 983 F.2d 872 (8th Cir. 1993).

261. Harrington filed a pro se Application for Post Conviction Relief on July 24, 1997.

262. Harrington filed an Amended and Substituted Post Conviction Petition on March 3,

2000, which the Iowa District Court denied on March 5, 2001.

263. Harrington appealed this denial, and the Iowa Supreme Court finally reversed his conviction and remanded his case for new trial based on *Brady* due process violations. *State v. Harrington*, 659 N.W.2d 509 (Iowa 2003).

264. The February 26, 2003 opinion in *Harrington v. State,* 659 N.W.2d 509 (Iowa 2003) held that the State of Iowa in obtaining Harrington's conviction for the murder of John Schweer had violated Harrington's right to due process. The Court ordered Harrington's conviction for the murder of John Schweer vacated, and the Court remanded the case back to the Iowa District Court for Pottawattamie County for a new trial.

265. The State of Iowa timely filed a Petition for Rehearing on said opinion, which by court rule caused the Iowa Supreme Court not to issue its Writ of Mittimus on its ruling to the Iowa District Court for Pottawattamie County until after the Supreme Court ruled on the State's Petition for Rehearing.

266. On or about April 17, 2003, the Governor of Iowa, the Honorable Thomas Vilsack, granted Harrington a Reprieve until such time as the Iowa Supreme Court ruled on the State of Iowa's Petition for Rehearing.

267. Pursuant to this Reprieve, and on the same date of the Reprieve, Harrington was released from prison after being continuously in custody for 25 years, 5 months, and 1 day — from the age of 17 years of age to 43 years of age — as a result of being wrongfully prosecuted and wrongfully convicted for Schweer's murder.

268. On or about April 18, 2003, the Iowa Supreme Court ruled on the State of Iowa's Petition for Rehearing and thereafter issued its Writ of Mittimus to the Iowa District Court for Pottawattamie County to vacate Harrington's wrongful conviction and to grant him a new trial.

269. Because the Governor's Reprieve expired on the Iowa Supreme Court's issuance of its Writ of Mittimus, on April 30, 2003, Harrington voluntarily surrendered himself to the Pottawattamie County Sheriff.

270. On the same date, April 30, 2003, the Iowa District Court for Pottawattamie County ordered Harrington's 1978 Conviction and Sentencing Order vacated and released him from custody on bond set in the amount of $100,000, with 10% payable in cash to the Clerk of Court, with the further condition of release that he be under the supervision of the pretrial release program of the Iowa Department of Corrections.

271. On October 24, 2003, without prejudice to its later re-filing the charge, the State of Iowa dismissed the charge against Harrington for Schweer's murder.

### The police reports regarding Gates are discovered in 1999

272. Ann Danaher worked at the Iowa men's prison and got to know Harrington and his family. She decided to look into his case. In 1999, Danaher requested the Council Bluffs Police Department's file for the Schweer murder. The withheld reports regarding Gates (among others) were included in the materials produced to her.

### Police and prosecution records policies and procedures

273. Policy regarding police records was that the Council Bluffs Police Department would give the County Attorney's Office a complete copy of all files.

274. The 1978 policy regarding criminal defendants' review of police records was that the Pottawattamie County Attorney's Office allowed attorneys to come to the office and physically inspect the entire file provided by the police.

275. As standard policy detectives could access the police records and were provided copies or were allowed to check them out.

276. As standard policy prosecutors could access the police records and were provided copies or were allowed to check them out.

277. The police and county attorneys thus provided information regarding the investigation of most, but importantly, not all of the alternate suspects, as at least eight police reports were missing from both the police and county attorney files.

278. For some unexplained reason when requested years later, the missing reports regarding Gates were somehow replaced in the police file regarding the Schweer murder investigation.

279. The attorney who represented Harrington at the 1987 post-conviction proceeding, James Cleary, testified that nothing in the materials furnished to him after a global discovery request indicated that there was a viable suspect identified early on as Gates, and that he received no reports that included the name Gates.

280. Similarly, the attorney who represented McGhee at his first post-conviction hearing, Alfredo Parrish, requested all files from the Pottawattamie County Attorney's Office and none of the material delivered to him contained information as to a viable suspect identified as Charles Richard Gates.

281. At least eight police investigative reports were not turned over to the defense in 1978 or in subsequent post-conviction review proceedings to either Harrington or McGhee, or their lawyers.

282. Possibly more evidence still remains missing based on testimony from one investigating police officer, Larsen.

283. Larsen testified about a particular known piece of still-missing evidence that relates to a suspect named Donald Mabbitt who had been given a sodium amytol test and that Brown wrote a report concerning this.

284. Of the eight undisclosed reports, each were a supplementary report to one initially filed on July 22, 1977 by Brown in the Schweer murder investigation

285. There is no plausible explanation why the Gates polygraph report is still missing.

**The Iowa Supreme Court orders a new trial for Harrington**

286. The Iowa Supreme Court specifically found that the reports regarding Gates were withheld from Harrington in 1978.  The court found that these reports were exculpatory because they showed that Gates was an alternative suspect for the Schweer murder, and were material because "Hughes, the primary witness against Harrington, was by all accounts a liar and a perjurer." The court reasoned that "...this circumstance makes it even more probable that the jury would have disregarded or at least doubted Hughes' account of the murder had there been a true alternative suspect.  Gates was that alternative." *Harrington v. State of Iowa*, 659 N.W.2d 509, 524 (Iowa 2003).

287. The Iowa Supreme Court held that Harrington's due process right to a fair trial was violated by the State's failure to produce the police reports documenting their investigation of Gates. It remanded Harrington's case for entry of an order vacating Harrington's conviction of first-degree murder and granting him a new trial.

### 2003 proceedings begin in the Schweer murder case

288. Matthew D. Wilber was the Pottawattamie County Attorney at the time Harrington was granted a new trial.

289. Wilber had to decide whether to retry Harrington for Schweer's murder. In addition, McGhee was also seeking a new trial based on the Iowa Supreme Court's decision in Harrington's case, and Wilber had to decide whether to oppose McGhee's petition and whether to retry McGhee for the crime.

290. Wilber claims to have personally spent hundreds of hours working on the Schweer murder case after the Iowa Supreme Court's decision. At Wilber's request, Council Bluffs Police Detective David Dawson was assigned to work full time on the Schweer case with Wilber. Wilber claims that he, Assistant County Attorney Jon Jacobmeir, and Dawson alone spent over 2,000 hours investigating the case.

### No probable cause

291. Wilber soon learned that he did not possess sufficient facts to support a reasonable and honest suspicion that Harrington or McGhee were guilty of the Schweer murder. The only witness who placed Harrington or McGhee at the murder was Hughes, and Hughes had admitted in 2000 that his testimony against them was false. There was no physical evidence that tied Harrington or McGhee to the Schweer murder independent of the admitted-liar Hughes. The prosecution witnesses that "corroborated" Hughes on some peripheral "facts" — Jones, Jacobs, Pride and Lee — had recanted. Wilber did not find the jailhouse snitches to be credible witnesses.

292. In addition, Wilber believed that the murder occurred between 3 and 4 a.m. based on the medical evidence and the two witnesses who heard the loud noise in the area. The time line based on Hughes's story was inconsistent with the crime occurring between 3 and 4 a.m.

**McGhee's plea agreement**

293. On September 2, 2003, after almost 26 years in prison for a crime he did not commit, McGhee signed a letter agreement with Wilber and the Pottawattamie County Attorney's Office. It provided that McGhee would enter an *Alford* plea to murder in the second degree and be sentenced to 25 years, with credit for time served. Since McGhee had already served more than 25 years in prison, McGhee would be released from custody if and when the court accepted his plea and sentenced him in accordance with the plea agreement.

294. In his *Alford* plea, McGhee was not agreeing to plead guilty and did not admit guilt for the Schweer murder. The plea agreement provided only that McGhee would stipulate to the minutes of testimony set forth in the 1978 Trial Information against him. McGhee also did not admit that the minutes of testimony were true. He merely acknowledged that the state was expected to present the evidence set forth in the minutes of testimony to provide the necessary factual predicate for his plea.

295. The plea agreement further provided that McGhee would cooperate with the investigation or prosecution of Harrington and truthfully testify at any trial or other court proceeding. The plea agreement further stated that it was the understanding of both the Pottawattamie County Attorney's Office and McGhee that McGhee's testimony in 2003 was expected to be consistent with the testimony he gave in 1978. Wilber knew that the factual predicate for McGhee's plea was the minutes of testimony in the 1978 True Information against

McGhee. McGhee's deal was for "truthful testimony" and Wilber honored the deal, inferring McGhee's testimony to be truthful and this then proved the State's theory of the case against Harrington to be false.

296. It was understood between McGhee and County Attorney Wilber that McGhee's plea would not be presented in court until after Harrington's retrial. Wilber could void the plea agreement if McGhee did not testify in accordance with the terms of that agreement.

### McGhee's September 2, 2003 deposition

297. McGhee gave his deposition in Harrington's criminal trial on September 2, 2003 after signing the plea agreement earlier that same day.

298. Under questioning by Harrington's lawyer, McGhee explained why he was taking a plea despite his innocence:

> A. The only reason why I've come to this plea agreement here is 'cause I know how the State is, and I'm just tired, man, you know, I'm tired of fighting with the State, you know. I have family members that have passed on. I have a father out there who's ill. I'm trying to get home and see him. And, you know, I'm willing to put this in the past, you know, and if it's by means of me taking a plea, you know, I'm willing to do that.
>
> Q. Even though you didn't do anything?
>
> A. Even though I'm innocent of this crime. [McGhee Dep. at 9].

299. Nevertheless, McGhee again testified in accordance with the 1978 lies that Harrington picked him up at his home on the night of the murder; they picked up Hughes at 24th and Pratt; and then Harrington and Hughes dropped McGhee off at his girlfriend's. McGhee again denied having any knowledge of the Schweer murder.

300. McGhee testified that he knew he had to testify that he was with Harrington and

Hughes that night in order to get the plea deal from the County Attorney. The County Attorney's Office made no claim that McGhee's testimony violated the plea agreement.

301. On or about September 2, 2003, Judge Abel of the Iowa District Court in and for the County of Pottawattamie vacated McGhee's 1978 conviction and granted him a new trial based on the summary judgment entered in McGhee's post-conviction relief proceeding pursuant to McGhee's plea agreement.

### Hughes's October 23, 2003 deposition

302. On October 23, 2003, in a court-ordered deposition, Hughes again recanted his 1978 testimony given at Harrington's trial and said that he lied about Harrington's involvement in the Schweer murder and that he had no information whatsoever that would connect Harrington to Schweer's murder.

303. Wilber knew that Hughes's deposition testimony meant that the prosecution would not be able to prove the minutes of testimony in the 1978 True Information against McGhee—or the renewed case against Harrington.

304. On October 24, 2003, McGhee entered his plea and the Court accepted it at around noon that same day. Wilber applied to dismiss the case against Harrington a few hours later and the Court granted his application to dismiss the case.

### Harrington's injuries

305. As a result of Defendants' unconstitutional conduct Harrington was arrested, prosecuted, and convicted. He suffered imprisonment for almost 26 years. He was incarcerated from November 16, 1977 until April 17, 2003. Harrington spent from age 17 until age 43 in

prison.

306. Harrington endured great mental and physical suffering while imprisoned for a crime he did not commit.

307. During those years, Harrington lost the society of his family, including his daughter, and friends. He lost his chance to marry and have more children.  He lost his chance to get an education and have a rewarding job. He lost the joys of a free life.

308. Harrington still suffers today from the effects of Defendants' misconduct. He has been thrown back into the world without money or the education or prospects that were open to him in 1977-78 or the intervening years of his incarceration.  He continues to suffer the stigma, lost reputation, and diminished employment opportunity that comes with being a "convicted murderer," a scar he would not bear but for the unconstitutional misconduct of these Defendants. Harrington has suffered other physical and emotional injuries as a result of Defendants' misconduct.

## COUNT 1

### *Fabricated and Perjured Testimony - § 1983 Civil Rights Violations*

309. This Count is authorized by 42 U.S.C. § 1983 and the Constitution of the United States, including the First, Fourth, Fifth, Sixth, and Fourteenth Amendments thereto.

310. Plaintiff incorporates by reference paragraphs 1 through 308 above as though fully set forth in this Count.

311. In the course of their investigation of Schweer's murder, Defendants Larsen, Brown, John Does One through Nine, Richter, and Hrvol solicited and procured through intimidation,

coercion, coaching, threats of prosecution, undisclosed promises of leniency, and other unlawful means, Hughes, then a minor, to provide false statements and perjured trial testimony against Harrington for Schweer's murder, and Pride, Jacobs, Jones, and Lee to provide corroborative false statements and trial testimony against Harrington for Schweer's murder.

312. Defendants concealed how they obtained these witnesses' false testimony.

313. In doing the acts and omissions alleged in this Count, Defendants Larsen, Brown, John Does One through Nine, Richter, and Hrvol were motivated by prejudice against Harrington because of his race.

314. At all times relevant to the events described in this Complaint, Defendants Larsen, Brown, John Does One through Nine, Richter, and Hrvol were state actors acting under the color of state law and within the scope of their employment and duties.

315. The unofficial or official policy, practice, custom, or procedure regarding fabricated and perjured testimony of Defendant Pottawattamie County, Iowa as implemented by its policy makers Richter and Hrvol was the moving force behind the violations of Harrington's constitutional rights and constituted deliberate indifference as attributable to the Defendant County itself as alleged in this count.

316. The unofficial or official policy, practice, custom, or procedure regarding fabricated and perjured testimony of Defendant City of Council Bluffs, Iowa as implemented by Defendants Larsen, Brown, and Does One through Nine was the moving force behind the violations of Harrington's constitutional rights and constituted deliberate indifference as attributable to the Defendant municipality itself as alleged in this count.

317. Defendant Pottawattamie County, Iowa through its policy makers failed to train and/or supervise its prosecutors regarding fabricated and perjured testimony and this was the moving force behind the violations of Harrington's constitutional rights and constituted deliberate indifference as attributable to the Defendant County itself as alleged in this count.

318. Defendant City of Council Bluffs, Iowa through its policy makers failed to train and/or supervise its police regarding fabricated and perjured testimony and this was the moving force behind the violations of Harrington's constitutional rights and constituted deliberate indifference as attributable to the Defendant municipality itself as alleged in this count.

319. At the times of Hughes' pre-probable cause statements, pretrial statements, and trial testimony Defendants Larsen, Brown, John Does One through Nine, Richter, and Hrvol knew Hughes to be a liar who before that had provided them with false information in the investigation of the Schweer murder.

320. Defendants Richter and Hrvol advised, supervised, administered, and/or participated in the investigatory acts of Defendants Larsen, Brown, and John Does One through Nine and/or with knowledge of these acts condoned and/or approved of these acts.

321. The above-described acts and omissions constituting the misconduct of Defendants Larsen, Brown, John Does One Through Nine, Richter, and Hrvol, and each of them, constituted an intentional violation of Harrington's freedom of association guaranteed him by the First Amendment to the United States Constitution and 42 U.S.C. § 1983, his rights to due process, a fair trial, and equal protection guaranteed him by the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983, and his rights against

unreasonable seizures of his body guaranteed him by the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983.

322. As a proximate result of the acts, omissions, and constitutional violations alleged in this Count, Harrington was arrested, prosecuted, convicted, and incarcerated for Schweer's murder.

323. As a proximate result of the acts, omissions, and constitutional violations alleged in this Count, Harrington suffered the incarceration and restrictions on his liberty as set out above; was deprived of his constitutional rights; suffered past and will suffer in the future severe physical injuries, pain and suffering, mental anguish, and emotional distress; and suffered past and will suffer in the future reputational and economic loss as a result of his wrongful arrest, prosecution, and incarceration for Schweer's murder, all to his damages in amounts to be proven at trial.

324. In doing the acts and omissions alleged above Defendants Richter, Hrvol, Larsen, Brown, and John Does One through Nine, and each of them, acted with a wanton disregard for the rights, needs, and feelings of Harrington, and by reason thereof he demands exemplary and punitive damages against these Defendants in an amount to be proven at trial.

## COUNT 2

### *Withheld Evidence – Brady and Giglio Violations*

325. This Count is authorized by 42 U.S.C. § 1983 and the Constitution of the United States, including the First, Fourth, Fifth, Sixth, and Fourteenth Amendments thereto.

326. Plaintiff incorporates by reference paragraphs 1 through 324 above as though fully set forth in this Count.

327. Before Hughes made his false pre-probable cause and pretrial statements referred to above against Harrington, Defendants Larsen, Brown, and John Does One through Nine, in the course of their investigation of Schweer's murder, became personally knowledgeable and aware of evidence that pointed to a viable alternative suspect for Schweer's murder by the name of Charles Richard Gates.

328. Before Hughes made the false pre-probable cause and pretrial statements referred to above against Harrington, Defendants Richter and Hrvol, while acting in an administrative, supervisory and/or investigative function, and not in a prosecutorial or quasi-judicial function, became personally knowledgeable and aware of evidence that pointed to a viable alternative suspect for Schweer's murder by the name of Charles Richard Gates.

329. Defendants hid exculpatory and other evidence of government agreements with witnesses known to them before, during, and after fabricating probable cause to arrest and prosecute Harrington.

330. Before, during, and after Harrington's 1978 trial for Schweer's murder, Defendants Larsen, Brown, John Does One through Nine, Richter, and Hrvol hid, refused, and/or failed to identify or produce for Plaintiff or his counsel any of the eight (now known, and possibly even more yet unknown and undisclosed) police reports or other evidence relating to the existence or viability of Gates as an alternative suspect for Schweer's murder and hid, refused, and/or failed to identify or produce for Harrington or his counsel any other evidence of government agreements with witnesses known to them in violation of Harrington's constitutional rights to due process and to prevent Harrington from defending himself against the false charge that he participated in Schweer's murder.

331. The acts and omissions alleged in this Count were done under the supervision, administration, direction, and/or with the approval and pursuant to the policies established by Defendants Richter and Hrvol in the investigation of Harrington for Schweer's murder.

332. In doing the acts and omissions alleged in this Count, Defendants Larsen, Brown, John Does One through Nine, Richter, and Hrvol were motivated by prejudice against Harrington because of his race.

333. At all times relevant to the events described in this Complaint, Defendants Larsen, Brown, John Does One through Nine, Richter, and Hrvol were state actors acting under the color of state law and within the scope of their employment and duties.

334. The unofficial or official policy, practice, custom, or procedure of Defendant Pottawattamie County, Iowa regarding withheld evidence as implemented by its policy makers was the moving force behind the violations of Harrington's constitutional rights and constituted deliberate indifference as attributable to the Defendant County itself as alleged in this count.

335. The unofficial or official policy, practice, custom, or procedure of Defendant City of Council Bluffs, Iowa regarding withheld evidence as implemented by Defendants Larsen, Brown, and John Does One through Nine was the moving force behind the violations of Harrington's constitutional rights and constituted deliberate indifference as attributable to the Defendant municipality itself as alleged in this count.

336. Defendant Pottawattamie County, Iowa through its policy makers failed to train and/or supervise its prosecutors regarding withheld evidence and this was the moving force behind the violations of Harrington's constitutional rights and constituted deliberate indifference as attributable to the Defendant County itself as alleged in this count.

337. Defendant City of Council Bluffs, Iowa through its policy makers failed to train and/or supervise its police regarding withheld evidence and this was the moving force behind the violations of Plaintiff's constitutional rights and constituted deliberate indifference as attributable to the Defendant municipality itself as alleged in this count.

338. Defendants Larsen, Brown, Hrvol, and Richter, in subsequent post-trial proceedings involving Harrington (and McGhee), and outside the scope of any prosecutorial function, in sworn testimony, depositions, and/or signed interrogatories continued to abide by those policies, practices, customs, or procedures by denying the existence of the viable alternative suspect Gates and of government agreements with witnesses in further violation of Harrington's constitutional rights.

339. Failure to preserve and disclose the exculpatory evidence and evidence of government agreements with witnesses was a direct and proximate cause of the violations of Harrington's constitutional rights, and his wrongful arrest, conviction, life sentence, and nearly 25 years of wrongful incarceration.

340. The above-described acts and omissions of Defendants Larsen, Brown, John Does One through Nine, Richter, and Hrvol, and each of them, constituted an intentional violation of Harrington's freedom of association guaranteed him by the First Amendment to the United States Constitution and 42 U.S.C. § 1983, his rights to due process, a fair trial, and equal protection guaranteed him by the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983, and his rights against unreasonable seizures of his body guaranteed him by the Fourth Amendment to the United States Constitution and 42 U.S.C.§ 1983.

341. As a proximate result of the acts, omissions, and constitutional violations alleged in this Count, Harrington was wrongfully arrested, prosecuted, convicted, and incarcerated for Schweer's murder.

342. As a proximate result of the acts, omissions, and constitutional violations alleged above, Harrington suffered the arrest, incarceration, and restrictions on his liberty as set out above; was deprived of his constitutional rights; suffered past and will suffer in the future severe physical injuries, pain and suffering, mental anguish, and emotional distress; and suffered past and will suffer in the future reputational and economic loss as a result of his wrongful arrest, prosecution, and incarceration for Schweer's murder, all to his damages in amounts to be proven at trial.

343. In doing the acts and making the omissions alleged in this Count Defendants Richter, Hrvol, Larsen, Brown, and John Does One through Nine, and each of them, acted with a wanton disregard for the rights, needs, and feelings of Harrington and by reason thereof he demands exemplary and punitive damages against these Defendants in an amount to be proven at trial.

## COUNT 3

### *Conspiracy under the Color of State Law to Deny Constitutional Rights*

344. This Count is authorized by 42 U.S.C. § 1985(3) and the Constitution of the United States, including the First, Fourth, Fifth, Sixth, and Fourteenth Amendments thereto.

345. Plaintiff incorporates by reference paragraphs 1 through 343 above as though fully set forth in this Count.

346. As described above, Defendants Richter, Hrvol, Larsen, Brown, and John Does One through Nine entered into a conspiracy to fabricate and present perjured evidence against Harrington, to hide exculpatory evidence and evidence of government agreements with witnesses, and to target, investigate, and prosecute Harrington as an African-American male in a manner different than Caucasian males, for example, Gates, and to deprive Harrington of his constitutional rights to freedom of association, against unreasonable seizures of his body, to due process, to a fair trial, and to equal protection guaranteed him by the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and to wrongfully convict Harrington for Schweer's murder (a Caucasian former police captain) with the ultimate object of the conspiracy being to arrest and convict someone of color of the highly publicized crime of Schweer's murder.

347. Each of the Defendants named in this Count participated in this conspiracy for the purpose of depriving, either directly or indirectly, Harrington of the equal protection of the laws or of the equal privileges and immunities under the laws.

348. Defendants caused acts in furtherance of the objects of this conspiracy whereby Harrington was deprived of having and exercising the rights and privileges of a citizen of the United States.

349. Without such conspiracy there would not have been a scintilla of evidence of Harrington's culpability for Schweer's murder.

350. Without such conspiracy there would not have been any probable cause to arrest, charge, and prosecute Harrington for Schweer's murder.

351. Without such conspiracy there would not have been a scintilla of evidence that in any way or manner would rebut the testimony of the numerous alibi witnesses for Harrington.

352. Without such conspiracy, Harrington would not have been arrested, charged, or convicted of Schweer's murder and would not have suffered the incarceration and restrictions on his liberty as set out above.

353. At all times relevant to the events described in this Complaint, the City of Council Bluffs Police Department had an official or unofficial policy, practice, custom, or procedure, implemented in a class-based manner and with invidiously discriminatory animus, to target, investigate, and prosecute African-American males in a manner different than Caucasian males.

354. The unofficial or official policies, practices, customs, or procedures described above were established and/or maintained by Defendants Larsen and Brown, and other police officers, including Defendants Does One through Nine, were aware of and followed these policies, practices, customs, or procedures.

355. At all times relevant to the events described in this Complaint, the Pottawattamie County Attorney's Office had an official or unofficial policy, practice, custom, or procedure, implemented in a class-based manner and with invidiously discriminatory animus, to target, investigate, and prosecute African-American males in a manner different than Caucasian males.

356. The unofficial or official policies, practices, customs, or procedures described above were established and/or maintained by Defendant Richter, the official policy maker for the Pottawattamie County Attorney's Office. Other attorneys employed at the County Attorney's Office, including Defendant Assistant County Attorney Hrvol, were aware of and followed these policies, practices, customs, or procedures.

357. At all times relevant to the events described in this Complaint, and for the purposes of this Count, Larsen, Brown, John Does One though Nine, Richter, and Hrvol were acting under the color of state law and within the scope of employment and duties.

358. The unofficial or official policies, practices, customs, or procedures of Defendant Pottawattamie County, Iowa to target, investigate, and prosecute African-American males in a manner different than Caucasian males as implemented by its policy makers was the moving force behind the violations of Harrington's constitutional rights and constituted deliberate indifference as attributable to the Defendant County itself as alleged in this count.

359. The unofficial or official policies, practices, customs, or procedures of Defendant City of Council Bluffs, Iowa to target, investigate, and prosecute African-American males in a manner different than Caucasian males as implemented by Defendants Larsen, Brown, and Does One through Nine was the moving force behind the violations of Harrington's constitutional rights and constituted deliberate indifference as attributable to the Defendant municipality itself as alleged in this count.

360. Defendant Pottawattamie County, Iowa through its policy makers failed to train and/or supervise its prosecutors regarding racially-based investigations and prosecutions and this was the moving force behind the violations of Harrington's constitutional rights and constituted deliberate indifference as attributable to the Defendant County itself as alleged in this count.

361. Defendant City of Council Bluffs, Iowa through its policy makers failed to train and/or supervise its police regarding racially-based investigations and prosecutions and this was the moving force behind the violations of Harrington's constitutional rights and constituted

deliberate indifference as attributable to the Defendant municipality itself as alleged in this count.

362. Upon information and belief, Defendants selected the particular course of action undertaken in the investigation and subsequent convictions in the Schweer murder because of racial discrimination and not merely in spite of its adverse effects on Harrington, McGhee, and all the witnesses involved who are African-American.

363. Harrington is an African-American male, consequently, Defendants targeted, investigated, and prosecuted him in a manner different than, for example, Gates, a Caucasian male.

364. Likewise, McGhee is an African-American male, consequently, Defendants targeted, investigated, and prosecuted him in a manner different than, for example, Gates, a Caucasian male.

365. Additionally, the main witnesses coerced, threatened, or intimidated into falsely testifying against Harrington (and McGhee), namely, Hughes, Plater, Pierce, Jones, Jacobs, Lee, and Pride are also African-American and all were juveniles (or very nearly so — 18) at the time of the Schweer murder investigation.

366. Harrington testified at his own sentencing hearing after the 1978 trial: "I just want you to know that no matter what happens, I know I'm innocent, and as long as, you know, I feel that inside, then I'm going to keep on fighting because I know I can't see myself locked up for the rest of my life for something I didn't do. . . . I feel I was judged by the color of my skin and not the content of my character, and I'll always feel that way until I get, you know, the kind of

verdict the testimony shows, and that's innocent or not guilty as they would say in the courtroom."

367. The above-described acts and omissions of Defendants Larsen, Brown, John Does One Through Nine, Richter, and Hrvol, and each of them, constituted an intentional violation of Harrington's freedom of association guaranteed him by the First Amendment to the United States Constitution and 42 U.S.C. § 1985(3), his rights to due process, a fair trial, and equal protection guaranteed him by the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1985(3), and his rights against unreasonable seizures of his body guaranteed him by the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1985(3).

368. As a proximate result of the conspiracy alleged above Harrington was wrongfully arrested, prosecuted, convicted, and incarcerated for Schweer's murder.

369. As a proximate result of the conspiracy alleged above and participated in by all Defendants, Plaintiff suffered the arrest, incarceration, and restrictions on his liberty as set out above; was deprived of his constitutional rights; suffered past and will suffer in the future severe physical injuries, pain and suffering, mental anguish, and emotional distress; and suffered past and will suffer in the future reputational and economic loss as a result of his wrongful arrest, prosecution, and incarceration for Schweer's murder all to his damages in amounts to be proven at trial.

370. In entering into the conspiracy alleged in this Count Defendants Richter, Hrvol, Larsen, Brown, and John Does One through Nine, and each of them, acted with a wanton

disregard for the rights, needs, and feelings of Harrington and by reason thereof he demands

exemplary and punitive damages against these Defendants in an amount to be proven at trial.

## COUNT 4

### *State Claim - Intentional Infliction of Emotional Distress*

371. This Count is so related to Counts 1, 2, and 3 that it forms part of the same case.

372. Plaintiff incorporates by reference paragraphs 1 through 370 above as though fully

set forth in this Count.

373. The Defendants' conduct set forth above was so outrageous and extreme as to go

beyond all possible bounds of decency so as to be utterly intolerable in a civilized community.

374. Defendants intentionally caused, or recklessly disregarded, the probability of

causing Harrington emotional distress.

375. Harrington suffered severe and extreme emotional distress.

376. The Defendants' outrageous conduct was the actual and proximate cause of

Harrington's severe or extreme emotional distress all to his damages in amounts to be proven at

trial.

377. In committing the acts alleged against them in this Count Defendants Larsen,

Brown, John Does One through Nine, Richter, and Hrvol, and each of them, acted with a wanton

disregard for the rights, needs, and feelings of Harrington, and by reason thereof he demands

exemplary and punitive damages against these Defendants in an amount to be proven at trial.

## COUNT 5

### *State Claim - Malicious Prosecution*

378. Although this Count only alleges a cause of action against Defendants Larsen, Brown, and John Does One through Nine, this Count is so related to Counts 1, 2, and 3 that it forms part of the same case.

379. Plaintiff incorporates by reference paragraphs 1 through 377 as though fully set forth in this Count.

380. The acts and conduct alleged above by Defendants Larsen, Brown, and John Does One Through Nine caused the wrongful prosecution of Harrington for Schweer's murder as alleged herein.

381. The prosecution ultimately resolved favorably for Harrington.

382. As a proximate result of the acts alleged in this Count, Harrington suffered the arrest, incarceration, and restrictions on his liberty as set out above; was deprived of his constitutional rights; suffered past and will suffer in the future severe physical injuries, pain and suffering, mental anguish, and emotional distress; and suffered past and will suffer in the future reputational and economic loss as a result of his wrongful arrest, prosecution, and incarceration for Schweer's murder all to his damages in amounts to be proven at trial.

383. In committing the acts alleged against them in this Count Defendants Larsen, Brown, and John Does One through Nine, and each of them, acted with a wanton disregard for the rights, needs, and feelings of Harrington, and by reason thereof he demands exemplary and punitive damages against said Defendants in an amount to be proven at trial.

## COUNT 6

### *State Claim - Loss of Parental Consortium*

384. This Count is so related to Counts 1, 2, and 3 that it forms part of the same case.

385. Harrington brings this Count in his capacity as father of Nicole Antoinette Harrington in behalf of his daughter Nicole Antoinette Harrington for loss of her parental consortium with her father.

386. Plaintiff incorporates by reference paragraphs 1 through 383 above as though fully set forth in this Count.

387. Absent the allegations set forth above, there would not have been a scintilla of evidence of Harrington's culpability for Schweer's murder.

388. Absent the allegations set forth above, there would not have been probable cause to arrest Harrington for Schweer's murder.

389. Absent the allegations set forth above, there would not have been a scintilla of evidence that in any way or manner would rebut the testimony of the numerous alibi witnesses for Harrington.

390. Absent the allegations set forth above, Nicole Antoinette Harrington would not have suffered the loss of her father Plaintiff Terry Harrington's consortium for the period of his incarceration alleged above.

391. As a proximate result of the acts of Defendants Pottawattamie County, City of Council Bluffs, Richter, Hrvol, Larsen, Brown, and John Does One through Nine alleged in this Count, Nicole Antoinette Harrington was deprived of the parental consortium of her father

Plaintiff Terry Harrington for the period of his wrongful incarceration, all to her damage in an amount to be proved at trial.

392. In depriving Nicole Antoinette Harrington of the loss of her father's consortium Defendants Richter, Hrvol, Larsen, Brown, and John Does One through Nine, and each of them, acted with a wanton disregard for the rights, needs, and feelings of Nicole Antoinette Harrington and by reason thereof she is entitled to exemplary and punitive damages against these Defendants in an amount to be proven at trial.

WHEREFORE, Plaintiff Terry Harrington respectfully prays judgment be entered in favor of Plaintiff Terry Harrington and against Defendants as follows:

1.      For general damages, including past and future emotional and physical injuries, pain and suffering, reputational injury, and loss of enjoyment of life, past and future, according to proof against all Defendants (Iowa law provides that Defendants Pottawattamie County and Council Bluffs pay any tort judgment for compensatory damages for which their officers and employees are liable within the scope of their employment or duties—*see* Iowa Code § 670.8 (2004));

2.      For special damages, including lost wages and loss of future earning capacity, medical expenses incurred and medical expenses that Plaintiff Terry Harrington can reasonably be expected to incur in the future, according to proof against all Defendants (Iowa law provides that Defendants Pottawattamie County and Council Bluffs pay any tort judgment for compensatory damages for which their officers and employees are liable within the scope of their employment or duties—*see* Iowa Code § 670.8 (2004));

3.     For exemplary and punitive damages against Defendants Richter, Hrvol, Larsen, Brown, and John Does One Through Nine (Iowa law allows municipalities to purchase insurance to protect municipal officers and employees against punitive damages awards—*see* Iowa Code § 670.8 (2004));

4.     For interest and the costs of this action;

5.     For attorney fees and expert fees and costs under state and federal law, including, but not limited to 42 U.S.C. § 1988, 28 U.S.C. § 2412, and Federal Rules of Civil Procedure Rule 54; and

6.     For such other and further relief as the Court deems proper.

Additionally, Plaintiff Terry Harrington in his capacity as father of Nicole Antoinette Harrington, prays judgment in favor of Plaintiff Nicole Antoinette Harrington and against Defendants as follows:

1.     For damages for Nicole Antoinette Harrington's loss of parental consortium according to proof against all Defendants (Iowa law provides that Defendants Pottawattamie County and Council Bluffs pay any tort judgment for compensatory damages for which their officers and employees are liable within the scope of their employment or duties—*see* Iowa Code § 670.8 (2004));

2.     For exemplary and punitive damages against Defendants Richter, Hrvol, Larsen, Brown, and John Does One Through Nine (Iowa law allows municipalities to purchase insurance to protect municipal officers and employees against punitive damages awards—*see* Iowa Code § 670.8 (2004));

3.     For interest and costs of this suit;

69

4.   For attorney fees and expert fees; and

5.   For such other and further relief as the Court deems proper.

DATED this 25th day of March 2005.

_____

Gerry L. Spence
J. Douglas McCalla
Larissa A. McCalla
THE SPENCE LAW FIRM, LLC
Spence, Shockey & McCalla
15 JACKSON ST.
P.O. BOX 548
JACKSON, WY 83001
Telephone: 307-733-7290
Fax: 307-733-5248
mccalla@spencelawyers.com


Thomas P. Frerichs, BL 00103016
FRERICHS LAW OFFICE, P.C.
751 PROGRESS AVE.
P.O. BOX 328
WATERLOO, IA 50704-0328
Telephone: 319-236-7204
Fax: 319-236-7206
tfrerichs@frerichslaw.com

# DEMAND FOR JURY TRIAL

Plaintiff Terry Harrington, by and through counsel, hereby demands trial by a jury of not less than six on all issues so triable herein.

DATED this 25th day of March 2005.

Gerry L. Spence
J. Douglas McCalla
Larissa A. McCalla
THE SPENCE LAW FIRM, LLC
Spence, Shockey & McCalla
15 Jackson St.
P.O. Box 548
Jackson, WY 83001
Telephone: 307-733-7290
Fax: 307-733-5248
mccalla@spencelawyers.com


Thomas P. Frerichs, BL 00103016
FRERICHS LAW OFFICE, P.C.
751 Progress Ave.
P.O. Box 328
Waterloo, IA 50704-0328
Telephone: 319-236-7204
Fax: 319-236-7206
tfrerichs@frerichslaw.com