IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| TERRY HARRINGTON,<br><br>      Plaintiff,<br><br>vs.<br><br>POTTAWATTAMIE COUNTY, IOWA;<br>THE CITY OF COUNCIL BLUFFS,<br>IOWA; JOSEPH HRVOL; DAVID<br>RICHTER; MATTHEW WILBER;<br>DANIEL LARSEN; LYLE BROWN;<br>and DAVID DAWSON,<br><br>      Defendants. | No.   05-CV-00178 |
| TERRY J. HARRINGTON,<br><br>      Plaintiff,<br>vs.<br><br>MATTHEW D. WILBER and<br>POTTAWATTAMIE COUNTY, IOWA,<br><br>      Defendants. | No.   05-CV-90616<br><br>**APPENDIX FOR SUMMARY<br>JUDGMENT BY POTTAWATTAMIE<br>COUNTY, AND PROSECUTORS<br>HRVOL, RICHTER, AND WILBER** |
| CURTIS W. MCGHEE, JR.,<br><br>      Plaintiff,<br>vs.<br><br>POTTAWATTAMIE COUNTY, IOWA;<br>THE CITY OF COUNCIL BLUFFS,<br>IOWA; JOSEPH HRVOL; DAVID<br>RICHTER; MATTHEW WILBER;<br>DANIEL LARSEN; LYLE BROWN;<br>and DAVID DAWSON,<br><br>      Defendants. | No.   05-CV-00255 |

COME NOW, Defendants, Joseph Hrvol, David Richter, Matthew Wilber, and

Pottawattamie County; and pursuant to Federal Rule of Civil Procedure 56 and Local Rule

56.1(a)(4), submit this Appendix Regarding Summary Judgment.

## TABLE OF CONTENTS

| Tab | Description | Page(s) |
|-----|-------------|---------|
| 1 | March 28, 2002 Opinion of Judge Longstaff in *Anderson vs. Larson* | 01-16 |
| 2 | Affidavit and Supplemental Affidavit of Chad Primmer | 17-20 |
| 3 | Partial Transcript of 1978 Trial Testimony of Curtis McGhee | 21-24 |
| 4 | Partial Transcript of 2003 Deposition of Curtis McGhee | 25-28 |
| 5 | Partial Transcript of Testimony of Larry Plater at 1978 McGhee Trial | 29-34 |
| 6 | Partial Transcript of Testimony of Tyrone Pierce at 1978 McGhee Trial | 35-36 |

Kristopher K. Madsen PO1009763
Robert M. Livingston PO 16838
STUART TINLEY LAW FIRM, LLP
310 W. Kanesville Blvd., 2nd Floor
P. O. Box 398
Council Bluffs, Iowa  51502-0398
Telephone: (712) 322-4033
Facsimile: (712) 322-6243
ATTORNEYS FOR DEFENDANTS POTTAWATTAMIE
COUNTY, HRVOL, RICHTER AND WILBER

/s/
David S. Baker
Daniel C. Estes
FISHER PATTERSON SAYLER & SMITH, LLP
51 Corporate Woods, Suite 300
9393 W. 110th Street
Overland Park, KS 66210

/s/_____

Margaret Popp Reyes
Assistant County Attorney
Pottawattamie County Attorney's Office
227 South 6th Street
Council Bluffs, Iowa  51501

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 29, 2006, the above and foregoing Appendix was electronically filed with the Clerk of the Court using the ECF system and that a true and correct copy of which was sent by regular U.S. mail to:

Alan O. Olson
Attorney at Law
3116 Ingersoll Avenue
Des Moines, Iowa  50312-3910

Stephen D. Davis
William H. Jones
Attorney at Law
10 S. LaSalle Street, Suite 3400
Chicago, Illinois  60603

David S. Baker
Daniel C. Estes
Attorney at Law
51 Corporate Woods, Suite 300
9393 W. 110th Street
Overland Park, Kansas  66210

Margaret Popp Reyes
Assistant County Attorney
Pottawattamie County Attorney's Office
227 South 6th Street
Council Bluffs, Iowa  51501

Michael Sciortino
Attorney at Law
209 Pearl Street
Council Bluffs, Iowa  51503

Thomas P. Frerichs
P.O. Box 328
Waterloo, IA 50704

Douglas McCalla
The Spence Law Firm, LLC
15 S. Jackson Street
P.O. Box 548
Jackson, WY 83001

FILED

02 '??? 28  AM 10: 49

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | | |
|---|---|---|
| THOMAS J. ANDERSON, and KAREN L. ANDERSON, | ) ) ) | |
| Plaintiffs, | ) ) | Civil No. 1-00-CV-10012 |
| vs. | ) ) ) | |
| JEFFREY L. LARSON, individually and as County Attorney for Shelby County, Iowa; DURWOOD EUGENE CAVANAUGH, individually and as Sheriff of Shelby County, Iowa; MARK HERVEY, individually and as Deputy Sheriff of Shelby County, Iowa; and TODD G. JONES, individually and as a Special Agent of the Iowa Division of Narcotics Enforcement, Shelby County, Iowa. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | ORDER |
| Defendants. | ) ) | |

Before the Court are defendants' motions for summary judgment. Defendant Todd Jones filed his motion on July 16, 2001, and the other defendants filed a separate motion on the same day. Plaintiffs filed a brief in resistance to Jones' motion on August 2, and a separate resistance to the other defendants' motion on August 6. Jones filed a reply brief on August 13. The matters are considered fully submitted, and oral argument is unnecessary.

I.    BACKGROUND

The follow facts are either undisputed or viewed in a light most favorable to plaintiffs. Thomas Anderson, plaintiff, is an attorney in Harlan, Iowa. Harlan is located in Shelby County. His wife, Karen Anderson, is the other plaintiff in this matter. Defendants are three law enforcement officers and the county attorney for Shelby County. The events pertinent to the

Defendants'
Appendix 01

motions now before the Court involve the investigation and arrest of Thomas Anderson in 1998.

Special Agent Todd Jones of the Iowa Division of Narcotics Enforcement, a defendant in the present action, was the key law enforcement official involved in the investigation of Thomas Anderson. Jones reports that he first learned in 1995 that Anderson might be involved with narcotics. That investigation was not directed at Anderson, but rather centered on a man named "Mr. Reining."[1] As a part of that investigation, however, Jones learned that Anderson might have been involved in "switching properties out of one person's name to another, giving that kind of advice," and that local law enforcement "believe[d] Mr. Anderson was involved in narcotics, either used or whatever." *See* Defendant Todd Jones' Appendix in Support of Motion for Summary Judgment (hereinafter "Jones' App.") at 51. Jones indicated he was only involved for one day in the 1995 investigation. Jones stated that he was uncertain if Reining was ever prosecuted or convicted, or if Anderson was further linked with any illegal drug involvement at that time. *Id.*

Later, in 1997, Jones went undercover in an investigation in Shelby County, Iowa. One of the targets of the investigation was Steve Schuemann. Jones formed a relationship with Schuemann, and methamphetamine transactions were made between them on three occasions. During a conversation with Jones, Schuemann indicated that his attorney, Thomas Anderson, was willing to accept drugs as payment for his services. Schuemann reports he gave Anderson "between a sixteenth and an eight ball of cocaine" sometime in late 1997 in hopes that the bill he owed Schuemann would be reduced accordingly, and that Anderson accepted the drugs. *See* Jones' App. at 41-42. Schuemann reports that he told Jones that at the bottom of his bill from

---

[1] Jones did not indicate Reining's first name in his deposition.

2

Anderson, it stated: "P.S. payment may be worked out in a variety of ways." *Id.* at 41. Schuemann reports that he shared this information with Jones, because he thought Jones "used to deal a lot of cocaine" and that he might need a lawyer someday. *Id.* at 42.

Jones had sufficient dealings with Schuemann by early 1998 to enable Shelby County Attorney Jeffrey Larson to bring numerous charges against him. Deputy Sheriff Mark Hervey arranged for a meeting with Schuemann where he was presented with the charges that would be filed against him. However, Schuemann was also presented with a chance to enter into an agreement with the Shelby County Sheriff's Office that would help him either reduce the charges against him or receive consideration for his cooperation during the sentencing phase of his case. The agreement required Schuemann's cooperation on a couple of matters, one of which was introducing undercover Special Agent Jones to Anderson.[2] Schuemann entered into this agreement with Shelby County authorities on February 9, 1998. *See* Jones' App. at 48-49.

After the agreement was reached, Schuemann contacted Anderson to tell him about his friend, Jones,[3] and related a fictitious story that Jones had been charged with operating a motor vehicle while intoxicated ("OWI") in another county. Schuemann told Anderson that Jones was from Sioux City, Iowa. *See* Jones' App. at 44-45. Schuemann indicated that Jones would speak with Anderson about having him represent him on the charge, and also indicated Jones would help pay for the bill he owed Anderson.

During this general time frame in early 1998, Anderson indicates that he thought Jones

---

[2] At the time Schuemann entered into the agreement, it appears he was still in an attorney-client relationship with Anderson.

[3] Jones used an alias of Todd Mintz, as he continued to act in an undercover fashion with Anderson. The Court will continue to refer to him as Jones.

3

Defendants'
Appendix 03

was a person who was suspected of murder. Anderson indicates he thought this because of things that his client, Schuemann, had shared with him. Schuemann had told him about another individual in addition to Jones, Doug Henderson. Schuemann told Anderson that he was supplied drugs by Henderson, and indicated that Henderson was generally suspected of a "chainsaw murder" in Council Bluffs that occurred in January 1998. *See* Jones App. at 44. Anderson asserts he believed Jones was affiliated with Henderson. Anderson claims that he believed because of the relationships between Jones, Schuemann and Henderson, that Jones might be the person who actually committed the "chainsaw murder." *See* Plaintiffs' Brief in Opposition to Jones' Motion for Summary Judgment, Exh. A at ¶ 4 (affidavit of Thomas Anderson).

On February 24, 1998, Jones was introduced to Anderson and they discussed the fictitious OWI charge. Later, on March 18, 1998, Jones contacted Anderson by phone at approximately 2:30 p.m. and tape-recorded the conversation. *See* Jones' App. at 74-88 (transcript of tape-recorded conversations between Jones and Anderson, March 18, 1998). During the phone conversation, Jones and Anderson discussed the charges against him. Jones also told Anderson that he owed Schuemann a favor and that they should talk about the attorney fees Shuemann owed Anderson. *Id.* at 75. Jones went on to state that he had a "half a z" on him, and asked Anderson if he understood what that meant. *Id.* Anderson stated he understood what the term meant. *Id.*[4] The tape then cut off at that point, but the record indicates Jones went to meet Anderson at his office soon thereafter.[5] Jones set up law enforcement surveillance outside

---

[4] Jones indicated a "half a z" means a half of an ounce of cocaine.

[5] Anderson states that he did not agree to meet with Jones, but that Jones just showed up.

Defendants'
Appendix 04

of Anderson's office before he entered.

At Anderson's office on March 18, 1998, Jones[6] recorded his conversation with Anderson

via a microphone with a tape recorder in his pocket. Jones and Anderson discussed the fictitious

OWI charge against him. Anderson placed a phone call on Jones' behalf related to the charge.

Later, Jones directed the conversation to the topic of Schuemann's bill.[7] Anderson then went and

got his files on Schuemann, and proceeded to explain in detail the work he had done for

Schuemann and his wife, and the amount of money he was owed. *Id.* at 80-83. After Anderson

was done explaining the amount he was owed, Jones proposed payment by asking Anderson if

Schuemann had mentioned to him "any kind of powder stuff." *Id.* at 83. Anderson indicated

that Schuemann had mentioned that to him. Jones then proceeded to give Anderson a baggie of

powder cocaine, which he proposed would cover $500 of the bill Schuemann owed Anderson.

*Id.* at 85. Based on the transcript of the tape-recorded conversation, Anderson did not audibly

agree or disagree with that statement. Then, Anderson was tape-recorded stating that it smelled

like "drywall," and the conversation generally indicates that he inspected the drugs at that time.

*Id.* After the delivery, Anderson and Jones talked about future action on Jones' OWI charge and

Jones left the office.

Anderson now states that he was so intimidated by Jones that he thought his "life was in

---

[6] Jones was dressed in a "very intimidating" manner, "including leather apparel and long hair, and can best be described as 'motorcycle-gang style.'" *See* Plaintiffs' Brief in Opposition to Jones' Motion for Summary Judgment, Exh. A at ¶ 6 (affidavit of Thomas Anderson). Jones also had a bulge in his pants, and while it most likely was the tape recorder, Anderson now states that he believed it was a gun. *Id.* at ¶ 8.

[7] Anderson states that Jones closed the door to his office and acted nervous, pushy, and acted in a manner that made him uncomfortable. *See* Plaintiffs' Brief in Opposition to Jones' Motion for Summary Judgment, Exh. A at ¶ 7 (affidavit of Thomas Anderson).

Defendants'
Appendix 05

imminent danger" unless he accepted the drugs, as he thought Jones was the individual who committed the "chainsaw murder," and that he did not have a reasonable opportunity to contact law enforcement officials regarding the matter. *See* Plaintiffs' Brief in Opposition to Jones' Motion for Summary Judgment, Exh. A at ¶¶ 10-11 (affidavit of Thomas Anderson). Within minutes of Jones' departure, police officers, including Deputy Hervey, entered Anderson's office and arrested him. Anderson voluntarily handed the officers the baggie of drugs when they entered his office.

At trial, a jury found Anderson guilty of the crime of solicitation of a felony under Iowa Code section 705.1.[8] The Iowa Supreme Court, however, reversed the decision of the trial court. *See Iowa v. Anderson*, 618 N.W. 2d 369 (Iowa 2000). The Court determined that nothing presented at the trial indicated Anderson solicited a felony, but rather the evidence showed he had simply responded to requests by Jones. The Supreme Court stated in a footnote, however, that it did not find Anderson innocent of all crimes, rather "whatever offense he committed, it was not solicitation of a felony." *Id.* at 374 n.2.

Anderson and his wife filed suit in this Court on March 16, 2000.[9] In Count I, Anderson has brought suit against all four defendants pursuant to 42 U.S.C. § 1983 and alleged that his constitutional rights under the 4th, 5th and 14th amendments were violated by the investigation, his arrest and imprisonment. In Count II, Anderson brings numerous claims under the laws of the state of Iowa: false arrest, false imprisonment, malicious prosecution, intentional infliction of emotional distress, outrageous conduct, invasion of privacy, negligence, gross negligence,

---

[8] The particular felony Anderson was charged with "soliciting" was delivery of a controlled substance.

[9] Anderson filed this suit before the Iowa Supreme Court reversed his conviction.

Defendants'

negligent hiring and retention and supervision. In Count III, Anderson alleges an intentional interference of the contractual relationship between himself and his client, Steve Schuemann. Additionally, Karen Anderson alleges she is owed damages for loss of spousal consortium pursuant to her husband's claims.

## II.   APPLICABLE LAW & DISCUSSION

### A.   Standard of Review

Summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Walsh v. United States*, 31 F.3d 696, 698 (8th Cir. 1994). The moving party must establish its right to judgment with such clarity that there is no room for controversy. *Jewson v. Mayo Clinic*, 691 F.2d 405, 408 (8th Cir. 1982). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis added). An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248. "As to materiality, the substantive law will identify which facts are material. . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

Further, "'whether summary judgment on grounds of qualified immunity is appropriate from a particular set of facts is a question of law.'" *Pace v. City of Des Moines*, 201 F.3d 1050, 1056 (8th Cir. 2000) (*quoting Lambert v. City of Dumas*, 187 F.3d 931, 935 (8th Cir. 1999)). "In

the event that a genuine dispute exists concerning predicate facts material to the qualified immunity issue, the defendant is not entitled to summary judgment on that ground." *Id.*

B.    Section 1983 claims

Plaintiff may seek a civil remedy against "'any person who, under color of any [state law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws[.]'" *See Braun v. Best*, 1998 WL 887270 (N.D. Iowa 1998) (quoting 42 U.S.C. § 1983). Section 1983 does not provide new rights, rather it provides a remedy for violations of substantive federal rights. *Id.* (citations omitted). A plaintiff must identify the rights upon which he alleges defendants have infringed, with reference to either a federal statute or constitutional provision. *Id.* (citing *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980)). Generally, the first step in assessing a section 1983 claim is to identify the contours of the underlying right said to have been violated. *See Grahm v. Connor*, 490 U.S. 386, 394 (1989). However, the Court finds it is best to first address the question of immunity with respect to defendant Larson.

1.    Claims Against Shelby County Attorney Jeffrey Larson

"If the prosecutor is acting as advocate for the state in a criminal prosecution, then the prosecutor is entitled to absolute immunity." *Brodnicki v. City of Omaha*, 75 F.3d 1261, 1266 (8th Cir.), *cert. denied* 519 U.S. 867 (1996) (citing *Buckley v. Fitzsimmons*, 113 S.Ct. 2606, 2615 (1993)). Actions covered under this absolute immunity are the initiation and pursuit of a criminal prosecution, the presentation of the state's case at trial, and other conduct intimately associated with the judicial process. *Id.* (citations omitted). If the prosecutor acts in an investigatory or administrative capacity, however, he is only entitled to qualified immunity. *Id.*

8

(citation omitted).

Shelby County Attorney Jeff Larson drafted the agreement with Steve Schuemann, *see* Appendix in Support of County Defendants' Motion for Summary Judgment, Exh. 5 at 34, and he stated it was his decision to charge Anderson with solicitation of a felony. *Id.* at 33. Larson admits to being aware of the investigation, but asserted that he "was not calling the shots as to how they [law enforcement officials] conducted their investigation." *Id.* at 33-34. Larson further stated he never met with Schuemann. *Id.* at 34-35.

All of the above mentioned actions by Larson appear to fit within the scope of county attorney activities which are entitled to absolute immunity. The record does not support the existence of a material issue of fact regarding whether Larson engaged in any activity which can be labeled investigatory or administrative. *See Brodnicki*, 75 F.3d at 1266. The Court thus finds Larson entitled to absolute immunity.

2.      Claims Against Law Enforcement Defendants

Plaintiffs have alleged that Anderson was wrongfully or falsely arrested and imprisoned in violation of the Fourth Amendment, and that his substantive due process rights and right to privacy under the Fourteenth Amendment were violated by the actions of law enforcement. While plaintiffs initially argued Thomas Anderson's Fifth Amendment rights were violated, plaintiffs appear to have abandoned any such argument as it has not been briefed.

a.      Fourth Amendment

"'In Iowa, false arrest is indistinguishable from false imprisonment,' 'and [it] do[es] not state a distinct cause of action.'" *Sheridan v. City of Des Moines*, 2001 WL 901267, (S.D. Iowa August 8, 2001) (quoting *Barrera v. Con Agra, Inc.*, 244 F.3d 663, 666 (8th Cir. 2001) and *Fox v.*

9

*McCurnin*, 205 Iowa 752, 757 (1928)). Therefore, plaintiff's claims for false arrest and imprisonment will be jointly addressed by this Court. There are two essential elements to plaintiffs' claim: "(1) detention or restraint against one's will; and (2) unlawfulness of such detention or restraint." *Sheridan*, 2001 WL 901267 at *3 (citing *Valdez v. City of Des Moines*, 324 N.W.2d 475, 477 (Iowa 1982)). The question at issue in this case is the latter — whether the detention of Thomas Anderson was unlawful.

Generally, an arrest requires probable cause. *See Dunaway v. New York*, 442 U.S. 200 (1979) and *Kurtz v. City of Shrewsbury*, 245 F.3d 753, 758 (8th Cir. 2001). "Probable cause exists if 'the totality of facts based on reasonably trustworthy information would justify a prudent person in believing the individual arrested had committed . . . an offense' at the time of the arrest." *Smithson v. Aldrich*, 235 F.3d 1058, 1062 (8th Cir. 2000) (quotation omitted).

In this case, it is undisputed that Thomas Anderson accepted a baggie of cocaine from undercover agent Todd Jones. Deputy Hervey and other law enforcement personnel were informed by Jones that Anderson had accepted the drugs, and they then arrested him. The fact that his conviction for solicitation of a felony was reversed by the Iowa Supreme Court does not factor into the equation of whether law enforcement had probable cause at the time of Anderson's arrest, because all they needed to have at the time of arrest was information indicating that "a crime" had been committed. *See Smithson*, 235 F.3d at 1062. The fact that Anderson was charged with the wrong crime does not dissipate the existence of law enforcement personnel's probable cause at the time of his arrest. This Court thus finds plaintiffs cannot establish a violation of Thomas Anderson's Fourth Amendment rights nor can they maintain such a section 1983 claim.

10

b.       Fourteenth Amendment

1.       Substantive Due Process

The substantive due process clause of the Fourteenth Amendment to the United States Constitution protects against egregious behavior by government officials. *See generally County of Sacramento v. Lewis*, 523 U.S. 833 (1998). The goal of substantive due process protections is to prevent government power from being used to oppress. *See generally Howard v. Grinage*, 82 F.3d 1343, 1349-50 (6th Cir. 1996). Procedural due process protections under this amendment, on the other hand, ensure the process accorded prior to the deprivation of a right is constitutionally sufficient. *Id.* In this case, plaintiff alleges a substantive due process violation was committed by law enforcement.

A substantive due process violation is committed if the government official's activity "shocks the conscience." *See S.S. v. McMullen*, 225 F.3d 960, (8th Cir. 2000) *(en banc)*, *cert. denied* 532 U.S. 904 (2001) (making alternative finding that state social workers' acts of putting child back into home where she was subjected to injurious contact with known pedophile did not rise to the level of shocking the conscience for the purposes of substantive due process analysis). Allegations of negligence, recklessness, and gross negligence are not sufficient to form the basis of a substantive due process violation claim. *Id.* at 964 (citing *Daniels v. Williams*, 474 U.S. 327, 332 (1986)).

In *County of Sacramento*, the Supreme Court of the United States addressed a case where a police officer engaged in a high speed chase with a speeding motorcycle. 523 U.S. at 836-37. The police chase resulted in the death of the motorcyclist and his passenger. *Id.* Representatives of the passenger's estate brought suit, and alleged the law

11

enforcement defendants had violated the passenger's substantive due process rights. *Id.* at 837. The Supreme Court determined that plaintiffs' claim "fails to meet the shocks-the-conscience test" as "police were faced with a course of lawless behavior for which the police were not to blame." *Id.* at 854-55. The Court indicated that, although it might have been better for the police officers not to engage in the high speed chase, the record failed to indicate the police had "improper or malicious motive" and their behavior did not shock the conscience. *Id.* at 855.[10]

Law enforcement's general actions in this case do not rise to the requisite level under the substantive due process standard. Law enforcement possessed information about Anderson as a part of an undercover investigation, and then law enforcement continued their undercover operation. Plaintiffs argue that "[c]onduct undertaken by law enforcement officials is offensive when it destroys the attorney-client relationship, [and] involves a lawyer's client in a scheme to cause the arrest of that lawyer on a felony charge while the client is still represented by the lawyer. . . ." *See, e.g.,* Plaintiff's Brief in Opposition to the Motion of Jeffrey Larson, Durwood Cavanaugh, and Mark Hervey (filed August 6, 2001), at 7-8. The fact that drugs were exchanged between Jones and Anderson in payment for the attorney fees of another client of Anderson's did not breach the attorney client privilege between Anderson and that client. It is a

---

[10] Plaintiff cited *Moran v. Clarke,* 247 F.3d 799 (8th Cir. 2001) as authority for asserting that defendants' actions constitute a substantive due process violation. A police officer had been the alleged "target" of a high-profile investigation. The investigation centered on what happened where police incorrectly arrested a mentally-impaired teenager and caused harm to him. *Id.* at 801. The officer in *Moran* was criminally indicted, but a jury acquitted him of all charges. The Eighth Circuit held that the police officer had a plausible claim of a violation of his substantive due process rights. The officer had introduced evidence that the police department "publicly and financially committed itself to producing a culprit for an alleged wrongdoing before any such wrongdoing was actually established," that the police department "violated procedures" and "pressure[d] officers to corroborate the Department's official line." *Id.* at 804. However, this opinion was vacated and was reheard en banc in September 2001. *See Moran v. Clarke,* 258 F.3d 904 (8th Cir. 2001). An en banc decision has not yet been published.

Defendants'
Appendix 12

common practice for someone other than the client to pay for an attorney's services,[11] and this action in and of itself does not breach the privilege. Further, plaintiffs argue that the "immediate arrest" was unfair. *Id.* at 8. While perhaps it would have been better had law enforcement allowed a little more time to elapse before arresting Anderson, thereby giving him ample opportunity to turn in the drugs to law enforcement, the Court does not find their decision to immediately arrest Anderson shocks the conscience.[12]

The Court recognizes that the allegations against Jones are different. Anderson asserts that Jones dress, behavior, and reputation forced him to accept the illegal drugs that he was offered because he was in fear of Jones. Viewing matters in a light most favorable to plaintiffs, the Court finds Jones may have demonstrated poor judgment by presenting himself to Jones in an intimidating fashion. However, the transcript of the conversation clearly indicates that Anderson was not so intimidated that Jones' undercover activity could possibly be labeled as shocking the conscience. *See* Jones App. at 74 - 88.

Therefore, the Court finds plaintiffs have not stated a plausible claim under the substantive due process clause.

---

[11] Although someone besides a client may pay for an attorney's services as a part of a typical fee arrangement, obviously, legal tender is the typical and appropriate form of payment.

[12] The Court recognizes the reality of the relationships involved in this case. Anderson was an attorney who defended accused persons in a small Iowa town. There may have been a history, or perhaps even 'bad blood,' between law enforcement, the county attorney's office, and Anderson. However, nothing in the record beyond general allegations that defendants were "out to get" Anderson indicates that he was "targeted" because of his past advocacy role in the criminal justice system, and any kind of speculation by this Court in this regard would be inappropriate.

13

Defendants'
Appendix 13

2.   Privacy

Plaintiffs have not identified any privacy interest, nor do they explain how any of the law enforcement defendants violated that interest. Therefore, summary judgment on plaintiff's section 1983 claim in this regard will also be granted.

c.   Qualified Immunity

Assuming plaintiffs had established a material question of fact regarding their rights under the Fourth or Fourteenth Amendments, the Court concludes that the law enforcement defendants would be entitled to qualified immunity from the section 1983 claims. *See Saucier v. Katz,* 121 S.Ct. 2151 (2001). The Court in *Saucier* indicated there are two inquiries when determining whether government officials, law enforcement officers in this case, are entitled to qualified immunity: *First,* whether a constitutional right would have been violated on the facts alleged, and *second,* assuming the violation is established, whether the right was clearly established must be considered on a very specific level. *Id.* at 2155. The second prong was further defined by the Court to mean that for an officer to be denied qualified immunity, the right he violated must have been "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 2156. As previously discussed, a constitutional right was not violated on the facts alleged, as officers simply conducted an undercover investigation that led to Anderson accepting drugs as payment for his legal services. However, even assuming such a right violation was established, the Court cannot conclude that reasonable law enforcement officials would have understood that what they were doing in investigating and arresting Anderson, in the manner in which they did, was violating any of Anderson's constitutional rights.

14

C.   Plaintiffs' Remaining Claims

Under the "Second Cause of Action" in their complaint, plaintiffs allege numerous claims under state and common law. Plaintiffs allege defendants committed false arrest, false imprisonment, malicious prosecution, intentional infliction of emotional distress, outrageous conduct, invasion of privacy, negligence, gross negligence, negligent hiring and retention and supervision. In their "Third Cause of Action," plaintiffs allege defendants' actions constitute intentional interference with the contractual relationship between Anderson and his client, Schuemann. These remaining claims are barred as defendants are entitled to immunity.

Beyond the previous discussions in this Order of immunity afforded to defendants, the Court finds that the limited waiver of sovereign immunity granted by the Iowa Tort Claims Act, IOWA CODE §§ 669.1 *et seq.*, does not apply in this case. In *Hawkeye By-Products Inc. v. Iowa*, 419 N.W. 2d 410 (Iowa 1988), the Iowa Supreme Court addressed the Iowa Tort Claims Act and the breadth of the waiver of sovereign immunity granted by it. The plaintiffs sued the Department of Agriculture of the state and one of its employees for negligent misrepresentation, fraudulent misrepresentation, and promissory estoppel. *Id.* at 411. The plaintiffs were seeking a permit to operate an animal rendering plant, and plaintiffs alleged that defendants provided assurances that the permit would be forthcoming. *Id.* at 410. The plaintiff then relied on this assurance and expended $312,000 to prepare to operate the plant, only to later find out that it would not receive a permit. *Id.* at 411. The Iowa Supreme Court inspected the waiver of immunity granted by the Iowa Tort Claims Act, and noted that claims of misrepresentation, deceit, or interference with contract rights are not included in the waiver of immunity. *Id.* (citing IOWA CODE § 25A.14(4)).[13] Despite the fact that plaintiff had labeled its claims negligent

---

[13] The Iowa Tort Claims Act now appears at Chapter 669 of the Iowa Code.

15

misrepresentation, fraudulent misrepresentation, and promissory estoppel, the Court stated: "Here, the gravamen of plaintiffs' claim is misrepresentation, deceit and interference with contract rights. The district court was correct in concluding that such claims will not lie against the sovereign." *Id.* at 411- 12. The Court went on to note that plaintiff's promissory estoppel claim, although not specifically excepted from the waiver of sovereign immunity provided by the Iowa Tort Claims Act, was grounded in a claim of false or inaccurate representations by employees of the State and that this "shift of legal theory" did not save the claim. *Id.* at 412.

The provisions of the Iowa Tort Claims Act do not apply to "[a]ny claim arising out of . . . false imprisonment, false arrest, malicious prosecution, abuse of process . . . ." IOWA CODE § 669.14(4). The gravamen of all of plaintiffs' remaining claims in this case are for false imprisonment, false arrest, malicious prosecution and abuse of process. This case is similar to *Hawkeye By-Products* where the gravamen of the plaintiffs' complaint was misrepresentation, and therefore excepted from the waiver of sovereign immunity. Clearly, the exceptions to the waiver of immunity provided by the Iowa Tort Claims Act are directly applicable to all of plaintiffs' remaining state claims and defendants are immune from being sued on those claims.

III.   CONCLUSION

For the above stated reasons, defendants' motions for summary judgment are granted. The Clerk of Court shall enter judgment in favor of defendants and against plaintiffs.

IT IS SO ORDERED.

Dated this _____ day of March, 2002.

RONALD E. LONGSTAFF, CHIEF JUDGE
UNITED STATES DISTRICT COURT

16

Defendants'
Appendix 16

## IN THE IOWA DISTRICT COURT FOR POTTAWATTAMIE COUNTY

CURTIS MCGHEE, JR.,                       )
                                          )
                    Applicant,            )        CASE NO. PCCV 081263
                                          )
Vs.                                       )
                                          )        SUPPLEMENTAL
STATE OF IOWA,                            )        AFFIDAVIT OF
                                          )        CHAD DOUGLAS PRIMMER
                    Respondent.           )

COMES NOW the affiant Chad Douglas Primmer, first being duly sworn on oath, and deposes and states as follows:

1. That Affiant Chad Douglas Primmer provided the Court with an Affidavit in this matter on August 29, 2003.

2. That within paragraph 7 of said affidavit was included Exhibits 6 and 8; said inclusion was done in clerical error and should not be deemed included therein.

3. This supplemental affidavit is provided to clarify the judicial record.

4. This supplement does not affect any other statements made within said affidavit, nor Applicant's entitlement to appropriate relief.

FURTHER AFFIANT SAYETH NOT.

JOHN W. KOCOUREK
Commission Number 145878
My Commission Expires
December 10, 2005

_____
CHAD DOUGLAS PRIMMER

Subscribed, sworn to, and acknowledged before me by Chad Douglas Primmer this 1ST day of September, 2003.

CERTIFICATE OF SERVICE
The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on _____, 20 03

By:  ☐ U.S. Mail          ☐ FAX
     ☑ Hand Delivered      ☐ Overnight Courier
     ☐ Certified Mail      ☐ Other

Signature 

_____
NOTARY PUBLIC

D005147

Defendants'
Appendix 17

IN THE IOWA DISTRICT COURT FOR POTTAWATTAMIE COUNTY

| | | |
|---|---|---|
| CURTIS MCGHEE, JR., | ) | |
| | ) | |
| Applicant, | ) | CASE NO. PCCV 081263 |
| | ) | |
| Vs. | ) | |
| | ) | |
| STATE OF IOWA, | ) | AFFIDAVIT OF |
| | ) | CHAD DOUGLAS PRIMMER |
| Respondent. | ) | |

COMES NOW the affiant Chad Douglas Primmer, first being duly sworn on oath, and deposes and states as follows:

1. That I have been Attorney of record on the above-noted matter since my appointment by the Court on January 6, 2003.

2. That the applicant, Curtis McGhee, Jr. and a co-defendant, Terry Harrington, were charged and convicted of first-degree murder in connection with the July 22, 1977 death of John Schweer.  See, State v. McGhee, 280 N.W.2d 436 (Iowa 1979); State v. Harrington, 284 N.W.2d 244 (Iowa 1979).

3. That the State's theory of how the crime was committed was identical in both McGhee's and Harrington's criminal prosecutions.

4. That in 1999, a person who had become in Harrington's criminal case requested the Council Bluffs Police Department's complete file relating to the murder of Schweer. Harrington v. State, 659 N.W.2d at 518.

5. That within this complete file, as noted in paragraph 4 of this affidavit, were eight police reports that had never been turned over to Harrington's counsel and served as the basis for Harrington's most recent post conviction relief proceeding. Id.

D005148

Defendants'
Appendix 18

6. That on February 26, 2003, the Iowa Supreme Court filed an opinion on Harrington's appeal, reversing the District Court's order, vacating Harrington's conviction, and granting Harrington a new trial. Id. at 525. The Supreme Court concluded that the undisclosed police reports were: (1) suppressed by the State; (2) exculpatory in that they suggested someone else (i.e. Charles Gates) committed the murder; and (3) material to the issue of guilt as a jury may very well have possessed a reasonable doubt as to whether Harrington shot the decedent. Id. at 522-525. Therefore, the Iowa Supreme Court concluded that Harrington's due process rights to a fair trial had been violated by the State's suppression of police reports. Id. at 525.

7. That the aforementioned police reports were identified as follows and are attached hereto, as though set forth fully herein this affidavit:

    a.  Exhibit 1: 7/28/77 police report from Sgt. L. Williams

    b.  Exhibit 2: 7/28/77 police report from Sgt. L. Williams

    c.  Exhibit 3: 8/11/77 police report from D.C. Larsen

    d.  Exhibit 4: 7/25/77 police report from Lloyd Brown

    e.  Exhibit 5: 8/12/77 police report from D.C. Larsen

    f.  Exhibit 6: 7/22/77 police report from L.W. Brown

    g.  Exhibit 7: 7/27/ 77 police report from B.J. Kremer

    h.  Exhibit 8: 7/23/77 police report from [unclear]

8. That the aforementioned police reports were not disclosed to the defense in State v. Curtis McGhee, Pottawattamie County Criminal Case Number 17852.

D005149

Defendants'
Appendix 19

9. That, as such, Curtis McGhee, Jr. is entitled to identical relief as Harrington in having his conviction vacated and a new trial provided to Curtis McGhee, Jr.

10. That, in my diligent preparation of this case, I obtained the file of David McCann, the original trial lawyer in the prosecution of Curtis McGhee, Jr.; that in my diligent review of same, I have noted those reports providing basis for the Iowa Supreme Court in the Harrington decision were not included with those reports provided to the defense in the case against Curtis McGhee, Jr., creating an identical violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. See, Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

11. That as there remains no genuine issues of fact in dispute and as Applicant Curtis McGhee, Jr. is entitled to judgment as a matter of law, this Court must enter summary judgment in favor of Applicant Curtis McGhee, Jr.

FURTHER AFFIANT SAYETH NOT.

_____
CHAD DOUGLAS PRIMMER

Subscribed, sworn to, and acknowledged before me by Chad Douglas Primmer this 29 day of August, 2003.



_____
NOTARY PUBLIC

CERTIFICATE OF SERVICE
The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on _____, 20.___
By: ☐ U.S. Mail          ☐ FAX
    ☐ Hand Delivered     ☐ Overnight Courier
    ☐ Certified Mail      ☐ Other:
Signature_____

COPY

1   IN THE DISTRICT COURT OF IOWA, IN AND FOR POTTAWATTAMIE COUNTY

2   STATE OF IOWA,                    )
                                      )
3        Plaintiff,                   )        No. 17852
                                      )
4   vs.                               )        TESTIMONY OF CURTIS
                                      )        WILLIAM McGHEE, JR.
5   CURTIS WILLIAM McGHEE, JR.,       )
                                      )
6        Defendant.                   )

7                        *  *  *

8        BEFORE:  Hon. J. L. Larson

9             ON:  May 10, 1978.

10                       *  *  *

11                   A P P E A R A N C E S

12   JOSEPH J. HRVOL and DAVID E. RICHTER,
     Assistant County Attorney and County Attorney
13   Pottawattamie County Courthouse
     Council Bluffs, Iowa  51501
14
15        Appearing on behalf of the plaintiff;

16   DAVID F. McCANN:, Esq.,
     Attorney at Law, of
17   Messrs. Dippel & McCann
     403 First National Bank Building
     Council Bluffs, Iowa  51501
18
19        Appearing on behalf of the defendant.

                         *  *  *

20

21

22

23

24

25

D002188

Defendants'
Appendix 31

12

A. Well, that's the only car dealer, I think, I had came

to.

Q. I see. In Council Bluffs?

A. That's right.

Q. Curtis, do you remember when you went to see Joe Rogers

about the diary, the calendar?

A. I didn't see him. He came to see me.

Q. You asked him to, though?

A. No. He just came.

Q. And he said out of the air, pulled July 22, said, "I'll

put your name on the calendar." Right?

A. Repeat that.

Q. He just pulled the date July 22 out of the air, and

said, "I'll put that date on the calendar." Right?

A. No. I just told him it would be an alibi. And that, would

he come to court and do something for me. And all he did

was change the calendar out on his own. I didn't tell him

what to mark down or nothing. He did it on his own.

Q. But you asked him to supply something for July 22; is

that right?

A. That's right.

Q. And that's because you were under suspicion for a robbery

in Omaha?

A. Yeah. That's what I had heard. The cops was looking for

me for a robbery or something.

D002199
Defendants'
Appendix 22

13

Q. Did you know at that time when you talked to Joe Rogers
that you were under investigation for murder here in
Council Bluffs?

A. No, I didn't.

Q. You don't recall having any conversations with any
police officers about a homicide here in Council Bluffs
prior to the time you went to see Joe Rogers?

A. No. I didn't say nothing about no murder. Not as I
remember.

Q. Nobody mentioned a murder to you?

A. No. All I heard was a robbery.

Q. Why is it, Curtis, that you went to Joe Rogers to ask
him to lie for you, and you didn't just go to Johnetta and
have her tell the truth?

A. Well, first of all, I didn't want to be involved in no
robbery. And second of all, I don't know.

Q. Is this a trip to Johnetta's house, is this some sudden
realization on your part? Is this something that just came
into mind, or has it been something that's a fact for a long
time?

A. You bet. It's a fact.

Q. Now, were those people that came in to testify, remember
Roderick Jones and Clyde Jacobs and Candy Pride, were
they present at 24th and Pratt when you were there that
night?

D002200

Defendants'
Appendix 23

14

A.   Yes, they was.

Q.   And they were present when you picked up Kevin Hughes?

A.   Yes, they was.

Q.   And Kevin Hughes got in the back seat of the car?

A.   Yes, he did.

Q.   And you were in the front seat on the passenger side?

A.   Yes, I was.

Q.   And Terry Harrington was the driver?

A.   Yes, he was.

Q.   And before that, he picked you up at your house at 11:30?

A.   Uh-huh (yes).  Made a phone call first.

Q.   He made a phone call first?

A.   Yeah.

Q.   Do you know who he called?

A.   Yeah.  He called me.

Q.   Oh, he called to your house before he came over?

A.   Yeah.  My house.

Q.   Did you see him earlier that evening?

A.   No, I didn't.

Q.   Did you see him the day before that?

A.   I don't think I did.  He makes sudden stops, you know.
Just come in just like that.  Pops in and out.

Q.   Did you, in that general time area, was he at your home
when Larry Plater was at your home?

A.   I don't think he was.

D002201
Defendants'
Appendix 24

**Page 1**

```
 1        IN THE IOWA DISTRICT COURT FOR POTTAWATTAMIE COUNTY
 2
 3   STATE OF IOWA,          )   NO. FECR017892
                             )
 4            Plaintiff,     )
                             )
 5        vs.                )
                             )
 6   TERRY J. HARRINGTON,    )
                             )
 7            Defendant.     )   DEPOSITION TAKEN ON
                             )   BEHALF OF DEFENDANT
 8
 9
10
11
12
13             * * * * *
14        DEPOSITION OF CURTIS W. McGHEE, JR., taken
15   before Nancy S. Jones, a Certified Shorthand
16   Reporter in and for the State of Iowa and Registered
17   Merit Reporter, on September 2, 2003, commencing at
18   1:24 p.m., at the Pottawattamie County Jail, Council
19   Bluffs, Iowa.
20             * * * * *
21
22
23
24
25
```

**Page 2**

```
 1             - A P P E A R A N C E S -
 2
 3   Matthew D. Wilber
       Pottawattamie County Attorney
 4   Jon J. Jacobmeier
       Chief Deputy County Attorney
 5   Pottawattamie County Courthouse
     227 South Sixth Street
 6   Council Bluffs, IA 51501        for Plaintiff
 7
 8   Thomas P. Frerichs, Esq.
       Frerichs Law Office, P.C.
 9   751 Progress Avenue
     P.O. Box 328
10   Waterloo IA 50704-0328         for Defendant
11
12   Chad Douglas Primmer, Esq.
     223 South Main Street
13   Council Bluffs, IA 51503-6504   and
14
     Alfredo Parrish, Esq.
15   Parrish, Kruidenier, Moss,
       Dunn, Boles & Gribble, L.L.P.
16   2910 Grand Avenue              for Curtis W.
     Des Moines, IA 50312           McGhee, Jr.
17
18
19   ALSO PRESENT:  Terry J. Harrington
                    Al Frerichs
20
21
22
23
24
25
```

**Page 3**

```
 1                     INDEX
 2
 3                   TESTIMONY
                                             Page
 4
 5   Direct Examination by Mr. Frerichs. . . . . . .  4
 6   No Cross-Examination
 7
 8
 9                    EXHIBITS
10                                           Marked
     Exhibit No.                            On Page
11
12       1     9-2-03 Plea Agreement           4
13       2     5-10-78 Direct and Cross-      18
               Examination, pages 2 through 21
14       3     10-7-77 Statement              51
15
16
17
18
19
20                             (The exhibits are attached to the
                               original transcript.)
21
22
23
24
25
```

**Page 4**

```
 1        (WHEREUPON, Exhibit Number 1 was marked
 2   for identification.)
 3        CURTIS W. McGHEE, JR.,
 4   being of lawful age, having been first duly
 5   cautioned and solemnly sworn by the Certified
 6   Shorthand Reporter, was examined and testified as
 7   follows:
 8        DIRECT EXAMINATION
 9   BY MR. FRERICHS:
10     Q. Could you state your name for the record,
11   please, and spell it for the court reporter.
12     A. Curtis William McGhee.
13     Q. Mr. McGhee, where do you currently reside?
14     A. Pottawattamie County Jail.
15     Q. I have previously marked or had the court
16   reporter mark a copy of a plea agreement that we
17   received today.  And that's marked as Deposition
18   Exhibit I.  Is that the agreement you entered into
19   this morning?
20     A. Yes, it is.
21     Q. What time did you enter into that
22   agreement?
23     A. What time was it?  We don't have an exact
24   time.
25     Q. Approximately what time did you enter into
```

Defendants'
Appendix 25

Page 37

1    MR. WILBER: Objection: asked and
2  answered. He's already indicated that he will
3  testify he was not there.
4        You may answer.
5  BY MR. FRERICHS:
6    Q. Go ahead and answer.
7    MR. PRIMMER: Go ahead and answer.
8    A. Question?
9    MR. FRERICHS: Go ahead and read it back.
10    (WHEREUPON, the last question was read by
11  the court reporter.)
12    A. That would be not true.
13  BY MR. FRERICHS:
14    Q. Did you ever go to Linda Lee's house that
15  night?
16    A. No, I did not.
17    Q. Let's talk about how this got started on
18  the evening in question, about how you first got
19  into contact with Terry Harrington or Kevin Hughes
20  on that evening.
21    A. Well, I was at my house at 2615 Meredith
22  Street. And on that night I just happened to be
23  sitting at home, really, with nothing to do. And
24  Mr. Harrington called my house, asked me what was I
25  doing that night. And I said, well, I'm pretty much

Page 38

1  not going to do nothing. He said, well, would you
2  like to go for a ride or something? I said, no, not
3  in particular. But beings that my car was broke
4  that night, I said, well, you know, you can do
5  something for me, you know. I'd like to go over to
6  my girlfriend's house, you know. You think you can
7  give me a ride over there? So he says, sure, I'll
8  come by and pick you up. He came by, picked me up.
9  He said, before we go to your girlfriend's house,
10  you know, I've got a stop to make.
11    Q. Let me stop you there. Who was in the car
12  when he picked you up?
13    A. Nobody.
14    Q. Just --
15    A. Just him by himself.
16    Q. And as I understand it, you're saying he
17  called you up just to see if you wanted to go for a
18  ride?
19    A. Yeah.
20    Q. What time was that?
21    A. That was about 11:30.
22    Q. That's when he called?
23    A. Yeah, about 11:30 when he called my house.
24    Q. How long after that did he show up?
25    A. Showed up maybe about five, ten minutes

Page 39

1  after that, five minutes.
2    Q. Do you know -- back then cell phones were
3  not a big deal.
4    A. No, we do not have no cell phones.
5    Q. So he had to make that phone call from
6  some position where he was five minutes away from
7  you?
8    A. I can't answer that. I don't know where
9  he was making the call from.
10    Q. Okay. But it had to have been someplace
11  where he could make the call and still get to your
12  house within five minutes, correct?
13    A. Exactly.
14    Q. He didn't live five minutes from you, did
15  he?
16    A. I can't recall how far he lived from me.
17    Q. Do you know where he lived?
18    A. I don't know the address.
19    Q. Do you know what street it was?
20    A. No, I don't recall that -- the street, but
21  I know it wasn't too far from me.
22    Q. How close of friends were you?
23    A. We was -- we was okay, yeah.
24    Q. What does that mean?
25    A. You know, all right.

Page 40

1    Q. How often did you see each other?
2    A. Maybe two, three times out of the week,
3  something like that.
4    Q. What about Kevin Hughes, how often were
5  you with him?
6    A. Not too often.
7    Q. What does that mean? Once a week?
8    A. I maybe ran into him every now and then.
9  That would be -- I'd probably see him maybe every --
10  every two or three weeks I might run into him, you
11  know.
12    Q. Was it out of the ordinary for
13  Mr. Harrington to call you up just to go for a ride?
14    A. No, it wasn't out of the ordinary.
15    Q. So you'd just go out riding around?
16    A. Yeah, just go riding around, you know,
17  going to little parties, going to little -- little
18  house parties, the little get-togethers, something
19  like that.
20    Q. And on the evening that Mr. Schweer was
21  killed or that -- the evening maybe before,
22  depending on when he was killed, did you have any
23  specific plans for that evening?
24    A. No. No.
25    Q. Okay. How -- Your girlfriend at the time

Defendants'
Appendix 26

---

**Page 41**

1  was Johnetta Jones?

2  A. Johnetta Jones.

3  Q. And was it out of the ordinary for you to

4  show up at her house at 11:30, 12 o'clock?

5  A. No.

6  Q. So she would -- you'd -- you'd get dropped

7  off at her house or go see her at her house around

8  midnight on a regular occasion?

9  A. Like on a Friday or Saturday, something

10 like that, Thursdays, it wasn't unusual for me to go

11 to her house at that time.

12 Q. Were her parents up?

13 A. Yeah.

14 Q. So they knew you were coming by that late?

15 A. I wouldn't go in the house. I would

16 just -- basically, just sit outside of her house,

17 sit on the front porch and talk to her.

18 Q. But her parents knew you were there --

19 A. Yeah.

20 Q. -- that late?

21    Okay. So the reason you agreed to go with

22 Mr. Harrington that night was because you wanted a

23 ride to your girlfriend's house?

24 A. No, because my car was broke, and that was

25 the only way I can get to her. He offered to give

---

**Page 42**

1  me a ride, take me over to her house, so I accepted

2  the ride.

3  Q. How far did she live from you?

4  A. Let's see. 47th and Fort from 26th and

5  Meredith is -- oh, man -- she was probably maybe --

6  maybe fifteen minutes away, something -- ten or

7  fifteen minutes away, something like that. Maybe

8  not that long.

9  Q. Where did she live?

10 A. She lived on -- I believe 53 -- 5320 North

11 47th, I believe it is.

12    (WHEREUPON, an off-the-record discussion

13 was held.)

14 BY MR. FRERICHS:

15 Q. And is 24th and Pratt on the way

16 between -- between where you were at and where

17 Johnetta Jones is?

18 A. No. While going to Johnetta Jones' house,

19 before I got there, that's when Mr. Harrington made

20 a statement to me about he needed to stop somewhere

21 else along the way. So I said, well, I need you to

22 just hurry up, man, and take me over to my girl's

23 house.

24    So we left from 26th and Meredith, went to

25 24th and Pratt, where as soon as we drove up,

---

**Page 43**

1  Mr. Harrington hollered out the window for

2  Mr. Hughes. So Mr. Hughes looked at him but didn't

3  respond. Mr. Harrington opened up the door, got

4  out, and they had an exchange of words I really

5  couldn't hear. They came back to the car.

6  Q. You don't know what was said?

7  A. No, I don't know what was said. He came

8  back to the car. I kept rushing him, man, look,

9  hurry up and take me over to my girl's house, and

10 then you can get on with your business. They came,

11 both of them got in the car, took me over to my

12 girlfriend's house, dropped me off, and I didn't see

13 them no more. I seen them a week later,

14 Mr. Harrington, that is.

15 Q. What time do you think it was when you got

16 dropped off at Johnetta Jones' house?

17 A. Let me see. Probably -- maybe about a

18 little before 12:00.

19 Q. So you -- Mr. Harrington called you at

20 11:30, correct?

21 A. Yes. It could have been, you know, five

22 minutes to 12:00 or maybe 12 o'clock, somewhere

23 around there.

24 Q. Okay. But -- so Mr. Harrington called you

25 at 11:30. He picked you up in five minutes. And

---

**Page 44**

1  then he drove to 24th and Pratt. And he stayed at

2  24th and Pratt for how long?

3  A. Stayed at 24th and Pratt -- it wasn't even

4  no more than five minutes.

5  Q. So stayed there maybe five minutes. And

6  then you still got to Johnetta Jones' house at about

7  midnight or five till?

8  A. Maybe about five -- five to 12:00,

9  something like that.

10 Q. Okay. When was the first time that you

11 brought up the name of Johnetta Jones to the

12 authorities, do you recall?

13 A. No, I never brought her name up.

14 Q. You didn't?

15 A. No.

16 Q. Why?

17 A. I believe how she came to court, I believe

18 my mother had something to do with that.

19 Q. So you didn't have anything to do with her

20 being involved?

21 A. No.

22 Q. Did you indicate to anyone at that time,

23 hey, I -- I couldn't have been at this incident,

24 because I was at my girlfriend's house?

25    (WHEREUPON, an off-the-record discussion

---

## Page 45

1 was held.)
2      AL FRERICHS: Tell him to stop con --
3 BY MR. FRERICHS:
4      Q. Do you need -- do you need help with
5 that -- that question?
6      A. No, we were just discussing something.
7      Q. Okay.
8      A. Yeah, repeat the question.
9      Q. Did you ever tell anyone, any of the
10 authorities, in the number of times you were
11 interviewed --
12      A. No, I --
13      Q. -- by the police that you couldn't have
14 been involved, because you were at your girlfriend's
15 house?
16      A. No, I didn't.
17      Q. Why not?
18      A. Just didn't tell them.
19      Q. Did you have a reason not to tell them?
20      A. Well, not -- not really. I just didn't
21 tell them.
22      Q. Well, if you knew that there was somebody
23 there that could account for your whereabouts during
24 this period -- questionable period of time when
25 Mr. Schweer was shot, why didn't you tell the

## Page 46

1 authorities to check with Johnetta Jones?
2      A. Because I just didn't tell them. I
3 was -- I just didn't tell them.
4      Q. For no reason?
5      A. Simply I just didn't tell them.
6      Q. Did you forget?
7      A. No, I didn't forget.
8      Q. So you knew all along where you were at;
9 you knew you were at Johnetta Jones' house on the
10 night in question. You just made the -- the
11 decision you weren't going to tell anybody that?
12      A. No, I didn't make the decision. I was
13 just -- I just -- I just don't know.
14      Q. You don't know why you didn't tell them?
15      A. Yeah.
16      Q. Okay. 'Cause you told them something
17 different, didn't you, when you met with police?
18 Didn't you tell them about some kind of involvement
19 with Joseph Rodgers on that night?
20      A. Yes, I did.
21      Q. And that was a lie?
22      A. With Joseph Rodgers?
23      Q. Yes.
24      A. No, it wasn't.
25      Q. So you were with Joseph Rodgers, as well,

## Page 47

1 on the night in question?
2      A. No, the reason why -- now we can -- we can
3 get into this. Hold for a minute.
4      Q. Do you need to consult with your attorney
5 again?
6      A. Yeah, I need to consult.
7      (WHEREUPON, an off-the-record discussion
8 was held.)
9 BY MR. FRERICHS:
10      Q. Have you had an adequate opportunity --
11      A. Yeah.
12      Q. -- to discuss your answer with your
13 attorney?
14      A. Yeah.
15      Q. Okay.
16      A. Yeah, the reason -- you mentioned Joseph
17 Rodgers?
18      Q. Right.
19      A. The -- me asking Joseph Rodgers to lie for
20 me, that right there is true. And the reason why I
21 asked him to lie for me is because earlier that day
22 my sister had informed me, when I came home, that
23 detectives had been at my house, at 2615 Meredith,
24 and that they was looking for me for a robbery. And
25 by me knowing that I didn't commit no crime, that I

## Page 48

1 didn't do any robbery, at the time my sister
2 finished telling me that -- Joseph Rogers used to
3 come over to my house on a regular basis. And by me
4 being, you know -- I was young, and I was scared,
5 terrified of going to jail, prison, whatever, I
6 asked him, will he lie for me.
7      Q. Okay. So under those circumstances, you
8 were young, you were afraid of the police?
9      A. I was -- no, I was afraid of going to
10 prison.
11      Q. Okay.
12      A. As well as the police, because I knew I
13 hadn't committed no crime.
14      Q. Well, if you knew you hadn't committed no
15 crime, why were you afraid of going to prison?
16      A. To what?
17      Q. If you knew you hadn't committed any
18 crime, why were you afraid of going to prison?
19      A. No, when the police came to my house and
20 stated they was -- they told my sister they was
21 looking for me for a robbery, and I knew I hadn't
22 committed no robbery, and I said, just in case if
23 they come out here, will you -- asked for me, I
24 asked him if he would lie for me, man.
25      Q. And that's because you were scared?

Defendants'
Appendix 28

420

1   A.  No.

2   Q.  How did this come to your attention, then, sir?

3   A.  When he opened his trunk, I just glanced around, and I

4   seen it.  Just kept on walking.

5   Q.  Where did you walk to?

6   A.  Home.

Q.  Was that the last you saw of Mr. McGhee and Mr. Harrington

that night?

9   A.  Yes.

10   Q.  Did Curtis ever come out of the house?

11   A.  I guess so.

12   Q.  Did you see him come out of the house, is what I want

13   to know.

14   A.  No.

15   Q.  Now, Mr. Plater, when was the next time you saw Curtis

16   McGhee?

17   A.  Couple days after.

18   Q.  One day or more than one day?

19   A.  About two days after.

20   Q.  Two days after?

A.  Yeah.

Q.  And what caused that meeting, if you remember?

A.  Well, I was going to play some ball.  He was out on the

porch.

Q.  When you say ball, you mean basketball or football?

D004449

Defendants'
Appendix 29

Case 4:05-cv-00178-RP-TJS   Document 93-3   Filed 10/03/06   Page 34 of 40
Case 4:05-cv-00255-RP-TJS   Document 95-3   Filed 09/29/2006   Page 34 of 40

421

1    A    Yeah.  Basketball.

2    Q    Where were you going to play at?

3    A    Saratoga School.

4    Q    Were you currently enrolled at Saratoga School at that

5    time?

6    A    I don't understand.

     Q    Were you a student there at that time or not?

     A    No.

     Q    Is there outdoor courts or indoor?

10   A    Outdoor.

11   Q    Outdoor?  Did you have a ball with you?

12   A    No.  They was already playing ball down there.

13   Q    Some friends of yours?

14   A    Yeah.

15   Q    Now, Mr. Plater, you say you saw Curtis on that day?

16   A    Yeah.

17   Q    How did that happen?

18   A    Well, he was sitting on the porch, you know.  And he

19   called me over.  We was talking, talking about Harrington.

20   He shot somebody, you know.

         MR. McCANN:  I can't hear the answer.

         MR. HRVOL:  You're going to have to speak up just

     a little louder, Mr. Plater.  Miss Reporter, could you read

     that last answer back?

         COURT REPORTER:  (The last answer was read back.)

D004450

Defendants'
Appendix 30

422

1      MR. HRVOL:  Q  Do, you remember exactly what Curtis told

2   you on that date, Mr. Plater?

3      THE WITNESS:  A  No.

4   Q  Now, Mr. Plater, what did you do when you heard that?

5   A  Well, I just, you know, started thinking then.  I just,

6   you know, just went to play some ball.

    Q  Did you ever have occasion, Mr. Plater, to find out--you

    can strike that, Miss Reporter.  Did you ever have occasion,

9   Mr. Plater, to look at the newspapers, T.V., radio on any of

    those dates that you've been talking about?

    MR. McCANN:  I'll object to that, your Honor.  Irrelevant

    and immaterial to any issue in this case.

    THE COURT:  Well, I understand it's for the purpose of a

    time frame.  For that purpose, it would be admissible,

15  and the objection is overruled.

16     MR. HRVOL:  Q  Do you remember ever reading a report

17  of a man killed in Council Bluffs?

    THE WITNESS:  A  Yeah.  Afterwards.

    MR. McCANN:  I'll object to that.

    THE COURT:  Overruled.

    MR. HRVOL:  Q  When was that, Mr. Plater?

                   A  After I got through playing ball.

                   Q  A man in Council Bluffs being killed?

D004451

Defendants'
Appendix 31

423

1          THE WITNESS:  A  Yes.

2     Q  Did you have any more conversation with Mr. McGhee

3     after that about the incident?

4     A  No.

5          MR. HRVOL:  That's all the questions I have for

      Mr. Plater.

                    CROSS-EXAMINATION.

8      By Mr. McCann, at 10:15 a.m., 5-9-78:

9     Q  Well, do I understand from your testimony, Mr. Plater,

10    that you're telling us that you were just passing by

11    Curtis' house?

12    A  Yeah.

13    Q  And he called you over?

14    A  Yeah.

15    Q  But you had not been at his house?

16    A  No.

17    Q  Well, do you remember when I took your deposition in

      regard to this case on the 28th of April?

      A  Yeah.

      Q  And didn't you, at that time, in your deposition, say

      that you had been over at Curtis' house when he told you

      this?

      A  You didn't say that?  Well, referring to page 7 of the

      deposition, "Question.  Where did this conversation take place?

                              Defendants'
                              Appendix 32

550

1    Q  Did you get tried for that breaking and entering, or

2    did you enter a plea or what?

3    A  I was tried.  I wasn't tried.  I just pleaded guilty.

4    Q  Now, Mr. Hartwell, did Mr. McGhee ever talk to you about

5    the charge that was pending against him?

6    A  Yes, he did.

7    Q  Did he ever talk to you about the events of July 22,

8    1977, in the early morning hours?

9    A  Yes, he did.

10    Q  Can you recall when that was, sir?

11    A  It started down in the weight room one day.  I can't

12    remember the date for sure.

13    Q  Do you remember what month it was?

14    A  It was February.

15    Q  How long after you had initially met him did this

16    conversation take place?

17    A  Oh, I ain't exact on it.  Maybe two weeks to a month.

18    Q  So it was sometime between 14 to 30 days after you had

19    been together?

20    A  Yeah.

21    Q  Well, what was said in that conversation, Mr. Hartwell?

22    A  He was telling me how it went down that night.

23    Q  Telling you how what went down, sir?

24    A  What they intended to do, and what accidentally

25    happened.

Defendants'
Appendix 33

551

1  Q. Well, can you tell us in your own words as closely

2  as you can recall to what Mr. McGhee told you, what

3  exactly he said?

4  A. Him, Terry Harrington and Kevin was going over to

5  steal a car at McCurdy or something like that.  And Kevin

6  stayed in the car.  And them two got out and got in the

7  trunk and went to the back of the building.  And after

8  that, the cop got shot.

9  Q. Did he say how the policeman got shot?

10  A. He must have got close enough to identify them.

11  Q. Did he tell you that?

12  A. No.  He didn't tell me that.

13  Q. Did he tell you why the policeman was shot, if you recall?

14  A. Because he didn't want to be identified.

15  Q. Now, did he ever mention the name Terry Harrington

16  to you?

17  A. Yes, he did.

18  Q. Did he ever mention the name Kevin Hughes to you?

19  A. Yes, he did.

20  Q. Did he ever indicate to you, Mr. Hartwell, who shot

21  the man?

22  A. Terry Harrington.

23  Q. Did he ever say where he was when Terry shot him?

24  A. He was with him.

25  Q. Did you ever have another conversation with him,

D004586

Defendants'
Appendix 34

520

name was, and I told him.

Q  What specifically did you tell him?

A  I told him my name is Tyrone Pierce.

Q  Did you then ask him anything?

A  Yeah.  I asked him, well, what was his name.  And he said, "McGhee."

Q  Did you have any other conversation?

A  Yeah.  He asked me what they got me charged with.  I said, "A burglary and auto theft."  And I asked him what he was charged with, and he asked me did I hear about that cop being shot in Council Bluffs at a car lot.  And I said, "Yeah.  Yeah.  I heard about it."

Q  What else did he ask you?

A  And then he asked me, did I do my burglary.  And I said, I'm not going to say nothing, because they got these microphones in the cell.  I don't know whether they can hear you or not.  I didn't know at this time.  So he told me that they couldn't hear me if I were to come up to his door.

Q  Come up to the door?  What do you mean?

A  Slide up there where that hole is in the door.  And I can talk through there.

Q  Would you talk quieter or the same volume?

A  Yeah.  I kind of lowered my voice so just he could hear.

Q  What did he ask you then after you did that?

D004555

Defendants'
Appendix 35

521

1   A   Well, then he asked me did I do my burglary. And I

2   said, "I don't know." Then I said--he said, "You can tell

3   me." So I said, "Yeah. I did it." I said, "Did you do that?

4   Did you do your crime?" And he said, "Yeah. I did it, but

5   they can't prove it on me. They don't have enough evidence."

     Q   Did he say anything after that?

     A   He said that Kevin Hughes is the one that's going to

     testify against me and--against him, and they got him in

9   jail in Omaha. "And when he goes up to the penitentiary,

10   my cousin--I got some people up there. And they're going to

11   put some pressure on him and make him sign a statement and

12   saying he had nothing to do with it."

13   Q   So Mr. McGhee was talking about Kevin Hughes to you, too,

14   then; right?

15   A   Yes. He asked me did I know Kevin. I said, "Yes."

16   And I said, "I was in a training school with him."

17   Q   Now, did you have any other conversation with him about

     that, or was that about the extent of it, Mr. Pierce?

19   A   That was about the extent of it.

20   Q   Was that the first day you were together up there?

     A   Yes.

     Q   Have you seen Curtis since then?

     A   Have I seen Curtis since?

     Q   Since he was moved out, or you were moved out, whichever,

     from that particular isolation cell.

D004556

Defendants'
Appendix 36