Gerry L. Spence
J. Douglas McCalla
Mel C. Orchard, III
Larissa A. McCalla
THE SPENCE LAW FIRM, LLC
Spence & McCalla
P. O. Box 548, 15 South Jackson Street
Jackson, Wyoming 83001
Telephone: (307) 733-7290
Fax: (307) 733-5248

Attorneys for the Plaintiff

# IN THE UNITED STATES DISTRICT COURT
# IN AND FOR THE SOUTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

| | |
|---|---|
| TERRY HARRINGTON, individually and in his capacity as the father of NICOLE ANTOINETTE HARRINGTON, <br><br> Plaintiff, <br><br> vs. <br><br> COUNTY OF POTTAWATTAMIE, IOWA, <br> CITY OF COUNCIL BLUFFS, IOWA, <br> DAVID RICHTER, in his individual and official capacities, <br> JOSEPH HRVOL, in his individual and official capacities, <br> DANIEL C. LARSEN, in his individual and official capacities, <br> LYLE W. BROWN, in his individual and and official capacities, and <br> JOHN DOES ONE THROUGH NINE, in their individual and official capacities, <br><br> Defendants. | Civil Nos. 4-05-CV-00178-RP-TJS <br> 05-CV-00255 <br> 03-CV-90616 <br><br><br> **PLAINTIFF TERRY HARRINGTON'S RESPONSE TO DEFENDANTS LARSEN, BROWN AND CITY OF COUNCIL BLUFFS' MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS;** <br><br> **AND REQUEST FOR ORAL ARGUMENT** |

COMES NOW, Plaintiff, Terry Harrington, (Harrington) by and through his lawyers, undersigned and hereby files the following Response to Defendants Larsen, Brown and City of

Council Bluffs' (Council Bluffs) Motion for Partial Judgment on the Pleadings. Points and authorities are set forth below as follows.

### TABLE OF CONTENTS

Table of Contents...................................................................................................2

A. Introduction......................................................................................................2

B. Standard of Review..........................................................................................3

C. Allegations in Plaintiff's Complaint.................................................................4

D. *Brady v. Maryland*..........................................................................................9

E. Conspiracy .....................................................................................................13

F. State Tort Claims and Municipal Liability.....................................................14

A.   Introduction

This Court is well aware of the facts forming the basis of Harrington's claims in the case at bar. As this Court summarized in denying Defendants' most recent motion for summary judgment in the defamation case, "the Iowa Supreme Court reversed Harrington's conviction, finding the prosecutor had committed a *Brady* violation by failing to disclose police reports identifying an alternative suspect. *See Harrington v. Wilber*, 353 F.Supp.2d 1033, 1036 (citing *Harrington v. Iowa*, 650 N.W.2d 509 (Iowa 2003)). In this motion, Defendants claim only that *Brady v. Maryland,* 373 U.S. 83 (1963) did not apply to police officers and thus was not clearly established law at the time of the investigation and trials relating to the Schweer murder in 1977. Plaintiff's § 1983 claims, however, that police officers violated his Fourth Amendment right to be free from false arrest, or unlawful seizure, was not raised in Council Bluffs' motion and survives even if their motion is granted completely.

As the facts and argument below will make clear, it was well established in 1977 that *Brady v. Maryland* applied to all law enforcement, from Defendant Dave Richter as the chief law enforcement official in the county, to the lowliest of patrol officer. There was a clearly established legal duty for police officers to understand and comply with the basic requirements and mandates of the United State Supreme Court and Fourteenth Amendment Due Process. Moreover, to suggest that the Council Bluffs police department did not know it was fundamentally wrong to hide evidence, manipulate witnesses, coerce testimony and frame another human being for murder, is contrary to the law, and contrary to common sense. It is also contrary to the Fourth Amendment, which clearly established in 1975 that a reasonable police officer would know that fabricating probable cause, thereby effectuating a seizure, would violate a suspect's clearly established Fourth Amendment right to be free from unreasonable seizures. *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975). Again, that claim survives even if Council Bluffs convinces this Court to grant its motion entirely.

Evidence beyond failure to provide exculpatory information, such as fabricating inculpatory evidence, is in and of itself a violation of plaintiff's substantive due process rights because such conduct "shocks the conscience." *Moran v. Clarke*, 296 F.3d 638, 647-648 (8th Cir. 2002) *(en banc)* (A purposeful police conspiracy to manufacture, and the manufacture of false evidence violates substantive due process); *Wilson v. Lawrence County Mo.*, 260 F.3d 946, 954 (8th Cir. 2001) (where officers use false testimony and false evidence to obtain a conviction; due process is violated).

B. Standard of Review

Defendants concede that this Court must assume that the "well-pleaded" factual allegations in the complaint are true, for the purposes of considering a Rule 12(c) motion. As

such, the claims that are to be determined on the pleadings will be addressed as such. Defendants incorporate by reference the summary judgment papers of Defendants Pottawattamie County, David Richter and Joe Hrvol, (collectively Pottawattamie County) for a portion of their motion. In review of what Pot. County actually submitted as supporting a claim of summary judgment, such reliance may be misplaced. Pot. County submitted four paragraphs of facts, none of which pertain to the issues raised in either the Pottawattamie County moving papers, or in the Defendants' motion here. As such, nothing has been converted to summary judgment and Harrington may rest on his pleadings to defeat all Defendants' motions in their entirety.[1]

C. <u>Allegations in Plaintiff's Complaint applicable to the instant motion by paragraph number</u>[2]

24. Defendants[3] Brown and Larsen were detectives with the Council Bluffs Police Department at the time of the Schweer murder. Brown and Larson were the lead investigators working on the case from July 22, 1977 through the criminal trials in 1978.

26. The police investigation included participation from the Pottawattamie County Attorney's office – particularly the well-documented participation by County Attorney Richter and Assistant County Attorney Hrvol

27. The early stages of the murder investigation involved more than a dozen suspects, none of whom included Harrington or McGhee.

32. Plaster casts of footprints and dog prints were taken in the area around Schweer's body.

---

[1] Allegations in a complaint, which are not contested by the moving party by affidavit or other evidentiary materials, are assumed true. *Kelsey v. Ewing*, 652 F.2d 4, 5 (8th Cir.1981). Rule 56(e), which provides, in part, that when a motion for summary judgment is supported by affidavit or otherwise under this rule the opposing party may not rest on his pleadings, does not alter these basic principles or the movant's burden of proof. *Stifel, Nicolaus & Co. v. Dain, Kalman & Quail*, 578 F.2d 1256, 1263 (8th Cir.1978). What is intended by the Rule is merely that *if* the moving party submits evidentiary material which convincingly shows that there is no genuine issue of material fact, the opposing party must come forward with specific facts that demonstrate a genuine issue for trial. *See Beckers v. Int'l Snowmobile Indus. Ass'n*, 581 F.2d 1308, 1311 (8th Cir.1978), *cert. denied*, 440 U.S. 986, 99 S. Ct. 1801, 60 L.Ed.2d 248 (1979); *Stifel, Nicolaus & Co., supra*, 578 F.2d at 1263.

*Elbe v. Yankton Independent School Dist. No. 1* 714 F.2d 848, 850 (8th cir. 1983)

[2] Plaintiff's Complaint is hereby incorporated herein by reference.
[3] Unless specifically set apart, "Defendants" includes all named defendants in Plaintiff's complaint.

34. Because Defendants withheld this information, Harrington's trial attorney did not have an opportunity to review the human footprint and dog print plaster cast evidence to support Harrington's defense.

40. Larsen testified that Charles Richard Gates ("Gates") immediately came into the scope of the investigation when someone mentioned that a man with a dog had been seen in the area of the murder.

42. Gates was known to carry a shotgun while walking his dogs.

44. A July 28, 1977 police report – withheld from Harrington – reflects that Council Bluffs police along with County Attorney Richter interviewed David Waide ("Waide"). The report states that Waide was shown a photograph of Gates and positively identified Gates as the man he had seen walking dogs in the area.... Waide insists that...he had seen Gates the night of the murder.

53. Larsen also wrote in his August 12, 1977 report – withheld from Harrington – that "suspect GATES, Charles R. had been given a polygraph examination...and it was the written opinion contained as an addendum to this report under heading 'Test Results' that suspect GATES was not truthful in his denial of owning a shotgun or having shot John Schweer." The written polygraph report has never been disclosed.

70. On or about September 9, 1977, Lincoln, Nebraska police stopped three African-American teenagers in the Cadillac stolen from the Fremont's Sid Dillon Oldsmobile. They were identified as Kevin Mack, 16; Roderick Jones, 17; and Candace Pride, 16, all of Omaha.

72. "Kevin Mack" was really Kevin Hughes ("Hughes").... Although he was only 16 years of age, Kevin Hughes had used several aliases.... He used these aliases because of his long criminal history under his real name of Kevin Hughes.

75. The Council Bluffs Police Department was notified of the arrests in Lincoln and advised that Hughes may have information on the Schweer murder. Larsen and Brown traveled to Lincoln to interview Hughes in connection with the Schweer case.

76. The Defendants were desperate to charge and convict someone for the murder of retired Police Captain Schweer. They needed a witness to do it, and Hughes was a perfect candidate because he was young, poor, African-American, and in trouble.

77. The Defendants told Hughes they knew he was involved in the car theft ring and that they knew that he and his fellow car thieves were responsible for the Schweer murder. They told him that he would be charged with the murder unless he could give them someone else. They told him that he would not be charged with the murder if he did so.

78. Defendants also told Hughes that there was a $5,000 reward for information leading to the arrest and conviction of Schweer's killers.

80. Hughes was very afraid of being charged with the murder of John Schweer. He was willing to say whatever Defendants wanted him to say to avoid a murder charge. He was also motivated by Defendants' offers of a $5,000 reward and help with his legal problems.

81. Hughes proceeded to tell a series of lies to save himself from murder charges in the Schweer case and to obtain reward money and leniency for his own crimes.

92. The Defendants knew that Hughes was a liar. But they were desperate to give the appearance of solving the Schweer case. The "worked with" Hughes to create a case against Harrington and McGhee by editing Hughes's story to eliminate the lies that were demonstrably false and by providing him with the details of the crime to make him seem more credible.

93. Hughes has admitted under oath that the story he told against Harrington and McGhee was false, and that he gave this false testimony due to Defendants' threats of murder charges, offers of reward money, and promises to help him with his other criminal charges. Hughes would not have agreed to implicate himself in the Schweer murder had the Defendants not assured him that he would not be charged with the murder if he did so.

94. Hughes has also admitted that the Defendants fed him may of the "facts" in his story against Harrington and McGhee. He has admitted that the Defendants brought him to the crime scene several times to better construct his false story, and that they talked to him "too many times to count" to put that story together.

98. Hughes first said that Schweer was killed with a pistol. Defendants told Hughes that Schweer was killed with a shotgun. Then Hughes said the murder weapon was a 20-gauge pump shotgun. Defendants told Hughes that it was a 12-gauge, and that they found a 12-gauge shell at McIntyre Oldsmobile near a Toronado parked in front of the new car showroom at McIntyre Oldsmobile. Hughes then changed his story to say that a 12-gauge shotgun was used, and that they intended to steal the Toronado on the night of the murder.

99. The 12-gauge shotgun was never found. Neither Harrington nor McGhee was ever found in possession of a 12-gauge shotgun.

128. Hughes has testified under oath that he made up the story about Harrington and McGhee shooting Schweer, including the part about Harrington putting his jacket over the shotgun.

130. In the course of their investigation of the Schweer murder, Defendants Larsen, Brown...Richter, and Hrvol solicited and procured through intimidation, coercion, threats of prosecution, undisclosed promises of leniency, and other coercive and unlawful means, the testimony of Roderick Jones ("Jones"), Clyde Jacobs ("Jacobs"), Linda Lee ("Lee"), and Candace Pride ("Pride") to provide statements and trial testimony against Harrington rebutting the testimony of the numerous alibi witnesses for Harrington that Harrington was with them at the time of the Schweer's murder and corroborating Hughes' testimony to the extent that

Harrington was with Hughes at a time shortly before the State of Iowa alleged Schweer was murdered.

134. The day before Hughes gave his November 16, 1977 statement that implicated Harrington in the Schweer murder Hughes went to the murder scene area with representatives of the county attorney's office.

135. Hughes testified that both police and prosecutors, together, had brought him to the murder scene several times to concoct and fabricate a story that implicated Harrington.

195. On or about November 16, 1977, an information charging Harrington with first-degree murder for Schweer's death was filed. Upon information and belief, County Attorney Richter and Assistant County Attorney Hrvol approved the decision to arrest Harrington. Harrington was arrested in Omaha, Nebraska that same day.

199. The Defendants knew that their whole case against Harrington and McGhee hinged on the coerced and coached statement of Hughes. No other witness placed Harrington or McGhee at the murder scene that night. They also knew that the physical evidence could only be linked to Harrington and McGhee by Hughes.

200. The Defendants also knew that Hughes had severe credibility problems despite their work with him and that a jury might reject his story if there was an alternative suspect.

201. The Defendants were concerned that Harrington and McGhee would avoid conviction by using Defendants' own reports about Gates to persuade the jury that there was reasonable doubt whether Harrington and McGhee had done the crime.

202. The Defendants concealed at least eight Council Bluffs Police Department reports from Harrington and McGhee to deprive them of material, exculpatory evidence that Harrington and McGhee could have used to defend themselves.

210. The Defendants continued to conceal information on the suspect Gates in post-conviction relief proceedings brought by Harrington and McGhee in 1987 and 1988. They also continued to conceal the means by which they had procured the false testimony against them.

211. Brown testified at Harrington's 1978 trial that there were no early-on alternate suspects and he failed to indicate that Charles Gates was ever a suspect. Brown also testified at Harrington's 1987 post-conviction review proceeding that there were no early-on alternate suspects and he failed to indicate that Gates was ever a suspect. In Harrington's 2000 post-conviction review proceedings, Brown testified that Gates was a suspect within a couple of days of the murder.

212. In discovery during Harrington's 1987 first post-conviction review hearing, his attorney James Cleary deposed Richter, Hrvol, Larsen, and Brown, and each of them denied that there were any alternate suspects.

213. In the Answers to Interrogatory No. 2 served by the State in McGhee's 1987 first post-conviction review hearing asking for the "names and addresses of all suspects in the case, why they were believed to be suspects and why they were eliminated as suspects" the State answered "[n]one other than plaintiff" with "plaintiff" thus referring to McGhee. Hrvol assisted in answering the discovery.

214. In the Answer to Interrogatory No. 14…in McGhee's 1987 first post-conviction hearing, which asked: "[w]hat was the result of the investigation of the report of a man and a dog…? The State averred that the "man and a dog" (Gates) was "never found or identified." Hrvol assisted in answering the discovery.

218. At the time of trial, Harrington was not aware of any evidence that pointed to Gates as an alternate suspect.

219. The undisclosed police reports <u>on their face</u> show that Detectives Brown and Larsen and prosecutors Richter and Hrvol had knowledge of the evidence pointing to Gates as a viable suspect in the Schweer homicide.

220. The Iowa Supreme Court noted that the State did not dispute that the evidence in question was known to the prosecution (or at least the police) during the trial. *Harrington v. State*, 659 N.W.2d 509, 522 (Iowa 2003).

221. Knowing the weakness of their false case, the Defendants resorted to a notorious source of false evidence: jailhouse snitches. Defendants sought out prisoners who were in jail with McGhee who would agree to falsely testify that McGhee admitted guilt for the Schweer murder in the hope of gaining leniency in their own cases.

222. The state used the false, fabricated information that McGhee either was with Harrington at the time of the murder or that McGhee was with Harrington earlier than the murder on the night of the murder in its case against Harrington, and the State also used the information that McGhee confessed to the Schweer murder to further support the denials of Harrington's subsequent review attempts.

246. In the Answer to Interrogatory No. 6 filed by the State in McGhee's 1987 first post-conviction hearing, which asked information about "witnesses used at trial who were promised leniency in exchange for their testimony against Curtis McGhee, and the specific promises made to each, the State answered: "None." Hrvol assisted in answering the discovery.

254. Richter and Hrvol both submitted depositions in Harrington's 2000 post-conviction review proceeding in which both stated that they did not necessarily tell Harrington's original trial counsel, Paul Watts, about the charges against Hughes, which were part of the Hughes' juvenile record and thus undiscoverable by defense counsel.

286. The Iowa Supreme Court specifically found that the reports regarding Gates were withheld from Harrington in 1978. The court found that these reports were exculpatory because they showed that Gates was an alternative suspect for the Schweer murder, and were material

because "Hughes, the primary witness against Harrington, was by all accounts a liar and a perjurer." The court reasoned that "...this circumstance makes it even more probable that the jury would have disregarded or at least doubted Hughes' account of the murder had there been a true alternative suspect. Gates was that alternative." *Harrington v. State of Iowa*, 659 N.W.2d 509, 524 (Iowa 2003).

305. As a result of Defendants' unconstitutional conduct Harrington was arrested, prosecuted, and convicted. He suffered imprisonment for almost 26 years. He was incarcerated from November 15, 1977 until April 17, 2003. Harrington spent from age 17 until age 43 in prison.

Rather than recite the remainder of the salient portions of Plaintiff's Complaint, ¶¶ 309 through 392 are incorporated herein and provide the specific legal claims that are supported by the foregoing factual allegations.

Taking the Defendants at their word, and assuming the above allegations are completely true, Defendants conspired to frame an innocent man, whom they knew was innocent, which was carried out by intimidation, coercion, coaching, threats of prosecution, undisclosed promises of leniency, concealing exculpatory evidence, and other unlawful means, to force Hughes, a minor, to provide false statements in order to manufacture probable cause and perjured trial testimony against Harrington to convict him of Schweer's murder. The Defendants also used the same deplorable and unlawful tactics to force Pride, Jacobs, Jones and Lee to provide corroborative false statements and trial testimony against Harrington to convict him of Schweer's murder. The defendants were motivated to do so because of Harrington's race, and they all were acting under the color of state law.[4] It is against this backdrop of truth, that this Court must begin its analysis of whether this kind of conduct is somehow protected and permissible under qualified immunity.

D. *Brady v. Maryland*

The first step in a qualified immunity analysis is to determine whether a viable constitutional claim has been asserted. *Seigert v. Gilley*, 500 U.S. 226, 232 (1991). For this

---

[4] Complaint at ¶¶ 309-316.

motion, Defendant Council Bluffs admits that a viable constitutional claim has been asserted with regard to the *Brady* claim. (Council Bluffs' Br. at 5). Their narrow argument[5] is that the police officers simply did not know that failing to turn over exculpatory evidence was a problem; that *Brady v. Maryland*, required such disclosure. Of course, it is not enough to assert that the police lacked knowledge; the standard is one of a reasonable police officer. The question for the jury is would a reasonable police officer know that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201-202 (2001). The Defendants have not set forth any facts that would take that issue from a jury, and hence, is not appropriate for judgment as a matter of law here.

Moreover, it is not required that a specific case confer such a duty upon governmental officials. Instead, "in light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Defendants then proceed to argue that no specific Eighth Circuit decision informed police officers of such an obligation. As set forth above, such a specific decision is not necessary. Plaintiff's police expert, Mike Nault, makes clear, "direction from the U.S. Supreme Court relating to the conduct of police investigations was immediately binding upon dissemination, and instantly applicable to the conduct of all such investigations, such as in the Miranda decision." Nault Affidavit, October 24, 2006 at ¶ 5.[6]

Mr. Nault goes on to say, "that all law enforcement officers therefore had an immediate duty to identify and disclose exculpatory evidence or information relating to any suspect in a

---

[5] A narrow view of due process, i.e. failure to provide exculpatory evidence, in the face of much broader and more egregious conduct will not insulate the state from being responsible for due process violations. *See Mooney v. Holohan*, 294 U.S. 294 (1935), cited more fully in McGhee's Brief in Opposition to Defendants Larsen, Brown and the City's Motion for Judgment as a matter of law, at. 3-5. McGhee's Brief, at ¶¶ 2-6, is incorporated and adopted herein by reference.

[6] Nault's Affidavit will be incorporated in Plaintiffs' Appendix to Plaintiff's Response to Summary Judgment so as to compile all materials relied upon outside of the pleadings in one place. This is due primarily to the fact that Defendant Council Bluffs incorporates by reference portions of Defendants Pottawattamie County's Motion for Summary Judgment.

police investigation..." *Id.* at ¶ 5. *Brady v. Maryland* was decided in 1963. This Court is being urged to accept that nearly fifteen years later, the Council Bluff's police department was unaware of this requirement.

Mr. Nault says that the law enforcement oath of office includes the "obligation to uphold the Constitution, and the findings of the United States Supreme Court are interpretations of the Constitution." Nault Aff. at ¶ 10. Nault was a police investigator during the time of the Schweer murder investigation. He states that it was clearly established, and had been for 14 years, that investigators were required to document and disclose exculpatory evidence to prosecutors. *Id.* at ¶¶ 11 and 12. Nault was specifically trained that "*Brady* rule compliance by the police was to be proactive, and not contingent upon a specific request of defense counsel, or prosecutor, given that the police are considered a part of the prosecution." *Id.* at ¶ 12. Nault's opinion is that Larsen and Brown failed to comply with a well-established duty when exculpatory information was not provided to Harrington, and as such, Larsen and Brown violated Harrington's constitutional rights to due process. *Id.* at ¶¶ 13-23.

The cases of *Moran, Wilson* and *Villasana v. Wilhoit*, 368 F.3d 976, 980 (8th Cir. 2004), all support the fact that a narrow interpretation of *Brady* is unwarranted, especially in light of the much broader and more disgraceful conduct that is alleged here against the Council Bluffs Defendants. Indeed, even if this Court were to follow the Third Circuit decision, *Gibson v. Superintendent of New Jersey Dept. of Law and Public Safety – Division of State Police*, 441 F.3d 427 (3d Cir. 2005), urged by Defendants, the broader allegations of fabricating evidence and coercion of witnesses, and other unlawful conduct, would not insulate Defendants from liability. *Gibson* spoke of "unusual" and undiscussed legal questions.[7] *Brady* has been a topic of

---

[7] *Gibson* addressed a policy to target African-Americans for stops. This conduct pales in comparison to conduct akin to not only stopping an African-American teenager, but then planting contraband in his car, then

police training since 1963, on par with *Miranda*. Nault Affidavit at ¶¶ 5-6. *Brady* was not an unusual or undiscussed legal question by reasonable police officers acting in good faith in a little town in Iowa, any more than it would be unusual or undiscussed in a little town in Wyoming, or Washington or any state in the Union, for that matter.

The case of *Evans v. City of Chicago*, No.04C3570, 2006 WL 463041 (N.D.Ill. January 6, 2006), holds more value for this Court than does *Gibson*. *Evans* states clearly that in 1976, "[i]f the Individual Defendants withheld material exculpatory material from Plaintiff's defense counsel, their actions violated Plaintiff's due process rights to a fair trial." *Id.* at p. 11. *Evans* dealt specifically with the actions of police officers in 1976. An older Third Circuit case is even more instructive of how long it has been recognized that suppression of evidence favorable to a defendant was a denial of due process. *See U.S. ex rel. Almeida v. Baldi*, 195 F.2d 815, 820 (3d Cir. 1952). Moreover, in *Pyle v. Kansas*, 317 U.S. 213, 216 (1942), the Supreme Court of the United States said that allegations of 'perjured testimony, knowingly used by the State authorities to obtain (a) conviction, and * * * the deliberate suppression by those same authorities of evidence favorable to (a defendant) * * * sufficiently charge a deprivation of rights guaranteed by the Federal Constitution, and, if proven, would entitle (him) to release from his present custody, *citing*, *Mooney v. Holohan*, 294 U.S. 103 (1935).

Defendants assert that they are immune from liability when they continued to testify falsely during post-conviction hearings. Because the Council Bluffs police built Harrington's case on a false foundation, they can never be insulated for their conduct while explaining the fruits of that false foundation as trial witnesses. And each time they lied under oath, they were forwarding the same contrived and unlawful premise. The Council Bluffs police never enjoyed

---

threatening, bribing and coercing other scared teenagers to lie and say they saw the contraband in the trunk originally. Harrington's situation was even worse than this example of subversive conduct.

immunity, absolute or qualified, because their conspiracy that began with a Fourth Amendment false arrest was brought to fruition when Harrington was convicted, and each time he was sent back to prison based upon their lies.

E.   Conspiracy[8]

Paragraph 346 of Plaintiff's Complaint states as follows:

As described above, Defendants...entered into a conspiracy to fabricate and present perjured evidence against Harrington, to hide exculpatory evidence and evidence of government agreements with witnesses, and to target, investigate, and prosecute Harrington as an African-American male in a manner different than Caucasian males, for example, Gates, and to deprive Harrington of his constitutional rights to freedom of association, against unreasonable seizures of his body, to due process, to a fair trial, and to equal protection guaranteed him by the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and to wrongfully convict Harrington for Schweer's murder (a Caucasian former police captain) with the ultimate object of the conspiracy being to arrest and convict someone of color of the highly publicized crime of Schweer's murder.

The above allegation, incorporating allegations 347 through 370, taken as true for the purposes of addressing Defendants' motion makes it patently clear that a jury issue exists on whether or not the defendants "voluntarily participated in a common venture." *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988). All that is necessary is that they "understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to ...further them. *Id.*

Because the Defendants cite to the summary judgment motion of Pottawattamie County that contains no facts that counter Plaintiff's allegations, Plaintiff's allegations are taken as true. *Kelsey v. Ewing,* 652 F.2d 4, 5 (8th Cir. 1981). Defendants' motion fails and Plaintiff's conspiracy allegations survive.

---

[8]   Because Defendants cite to Defendants Pottawattamie County's brief on Summary Judgment on the conspiracy claim, Plaintiff's Response to Pottawattamie County's brief is incorporated herein by reference.

F.      State Tort Claims and municipal liability

Defendant Council Bluffs refers to the Pottawattamie County Motion in support of its motion regarding Plaintiff's state law tort claims and *Monell* claims. Plaintiff's Response to the Pottawattamie County summary judgment is therefore incorporated herein.

In summary, Plaintiff's allegations that the unwritten policy of Richter, the chief law enforcement official in the county, that the complete police files were to be turned over is uncontroverted by Defendants' assertions and Defendants' meager submission of material facts on summary judgment. Plaintiff's allegations, therefore, stand as alleged and properly plead a claim under § 670.8 of the Iowa Code, and in compliance with *Owen v. City of Independence, Mo*, 445 U.S. 622, 638 (1980); *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999); and *Pembaur v. Cincinnati*, 547 U.S. 469 (1986).

G.      Conclusion

For the foregoing reasons, this Court should deny Defendants' Motion for Partial Judgment on the Pleadings on all counts. Plaintiff requests that this Court grant oral argument due to the numerous factual issues raised by his Complaint.

Dated this 27th day of October, 2006.

Gerry L. Spence
J. Douglas McCalla
Mel C. Orchard, III
The Spence Law Firm, LLC
Spence & McCalla
15 S. Jackson St.
P.O. Box 548
Jackson, WY 83001
307-733-7290 Telephone
307-722-5248 Fax
orchard@spencelawyers.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of October, 2006, a true and correct copy of the foregoing PLAINTIFF'S RESPONSE TO DEFENDANTS LARSEN, BROWN AND CITY OF COUNCIL BLUFFS' MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS was served upon counsel named below, at the addresses set out below by U.S. Mail in a properly-addressed envelope, postage prepaid.

| | | |
|---|---|---|
| David Stephen Baker | [ ] | U.S. Mail, Postage Prepaid |
| Daniel C. Estes | [ ] | Express Mail |
| Fisher Patterson Sayler & Smith LLP | [ ] | Facsimile Transmission |
| 51Corporate Woods, Suite 300 | [ ] | Federal Express |
| 9393 W 110th Street | [✓] | Electronic Filing |
| Overland Park, KS 66210 | | |
| dbaker@fisherpatterson.com | | |
| destes@fisherpatterson.com | | |
| | | |
| Stephen D. Davis | [ ] | U.S. Mail, Postage Prepaid |
| William H. Jones | [ ] | Express Mail |
| Canel, Davis & King | [ ] | Facsimile Transmission |
| 10 South La Salle Street, Suite 3400 | [ ] | Federal Express |
| Chicago, Illinois 60603 | [✓] | Electronic Filing |
| sdavis@daviskinglaw.com | | |
| wjones@daviskinglaw.com | | |
| | | |
| Kristopher Madsen | [ ] | U.S. Mail, Postage Prepaid |
| Stuart, Tinley, Peters, Thorn, Hughes, Faust & Madsen | [ ] | Express Mail |
| | [ ] | Facsimile Transmission |
| 310 W. Kanesville Blvd., 2nd Floor | [ ] | Federal Express |
| PO Box 398 | [✓] | Electronic Filing |
| Council Bluffs, IA 51502-0398 | | |
| madsen.kristopher@stuarttinley.com | | |
| | | |
| Alan O. Olson | [ ] | U.S. Mail, Postage Prepaid |
| Olson Law Office, P.C. | [ ] | Express Mail |
| 3116 Ingersoll Avenue | [ ] | Facsimile Transmission |
| Des Moines, IA 50312-3910 | [ ] | Federal Express |
| aoo@olson-law.net | [✓] | Electronic Filing |

| | | |
|---|---|---|
| Margaret Pott Reyes | [ ] | U.S. Mail, Postage Prepaid |
| Assistant County Attorney | [ ] | Express Mail |
| Pottawattamie County Attorney's Office | [ ] | Facsimile Transmission |
| 227 S. 6th St., Ste. 532A | [ ] | Federal Express |
| Council Bluffs, IA 51501 | [x] | Electronic Filing |
| maggie.PoppReyes@pottcounty.com | | |

| | | |
|---|---|---|
| Michael A Sciortino | [ ] | U.S. Mail, Postage Prepaid |
| City Of Council Bluffs Legal Dept. | [ ] | Express Mail |
| 209 Pearl Street | [ ] | Facsimile Transmission |
| Council Bluffs, IA 51503 | [ ] | Federal Express |
| MASciortino@aol.com | [x] | Electronic Filing |

_____
Gerry L. Spence
J. Douglas McCalla
Mel C. Orchard, III
THE SPENCE LAW FIRM, LLC
Spence & McCalla
P.O. Box 548
Jackson, WY 83001
307-733-7290  Telephone
307-733-5248  Fax
mccalla@spencelawyers.com
orchard@spencelawyers.com